### JAMES et al. v. BROPHY.

#### (Circuit Court of Appeals, First Circuit. October 25, 1895.)

#### No. 132.

1. CHARTER PARTY—WHAT CONSTITUTES.

Sellers of a cargo of lumber chartered a vessel to take the lumber to Africa, where it was to be delivered, and had drawn up an instrument purporting to be a charter party between the shipowners and the purchaser of the lumber, which was signed by the respective agents of these parties, and which stated the rate of freight to be $16.50 per thousand feet. On the same day the sellers of the cargo signed a document stating that they had that day chartered the same vessel to E., who was the agent of its owners, and in this paper they agreed, "in consideration of E. making a charter party with" the purchaser's agent "at $16.50 per thousand feet," to pay said E. "the difference between amount of freight collected by vessel at Africa and $5,900, amount of charter," and there was a further recital, "All other conditions to be according to C. P., dated" the same day, between the purchaser's agent "and E., agent of vessel." Both instruments were written on letter heads of E. *Held*, that the latter instrument was a charter which, by reference to the other instrument, embodied and adopted all the terms and conditions contained therein, saving the matter of freight.

2. SAME—UNILATERAL CONTRACT.

Though the instrument was not signed in behalf of the ship or her owners, it having been delivered to and accepted by them, and the ship having entered on its performance, it was binding upon both parties.

3. SAME.

A vessel may be chartered by parol.

4. DEMURRAGE.

When, in the charter party, Sundays only are excepted from running days, the charterers are not exempt from demurrage for holidays and days on which laborers will not work.

5. SAME.

When a cargo is to be delivered within reach of the ship's tackles, the charterers are not exempted from demurrage by a breakdown of one of the lighters.

Appeal from the District Court of the United States for the District of Massachusetts.

Libel by L. S. Brophy against Charles L. James and others. There was a decree for libelant, and defendants appeal. Modified.

Charles T. Russell, for appellants.

Frederic Dodge, for appellee.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

WEBB, District Judge. The libel was properly against the appellants alone. The Compagnie Française de l'Afrique Occidentale and John F. Brooks, the agent of that company, were in no way parties to the contract between the libelant and the defendants, relied on and set out in the libel as the basis of this demand for demurrage. That Brooks and his principal, the Compagnie Française, were connected with the business transaction which gave occasion to that contract, did not make them parties to it. Nor does the fact that they entered into a different or independent charter with the shipowners change their relation to this case. It is manifest that James & Abbot, having sold or contracted to sell a cargo of Southern pine lumber to Brooks as agent of the Compagnie Française, chartered the bark Tremont to take on board that cargo at Ship Island, and thence to transport it to Dakar and Sierra Leone, on the west coast of Africa, and to discharge it partly at one of those ports and partly at the other, for the round sum of $5,900. For some reason of their own, perhaps that they might make the apparent price of lumber at the place of shipment as high as possible for their advantage in making other sales, they desired to have it appear that freight was obtained at $16.50 per thousand feet, intake survey. It should be remarked that this cargo was sold to be taken by the purchaser, at Ship Island, for a gross sum per thousand feet, to be made up by adding to the price of the lumber the amount of insurance and freight which the purchaser might have to pay. All these facts, excepting the suggested motive for the nominal freight, appear in the defendants' answer to the libel. Whatever may have been their motive, or the reasons influencing them, they caused another charter to be drawn up, specifying with minuteness all the terms of their charter, except only the freight to be paid the ship for the voyage. This instrument purported to be a charter party between the shipowners and the Compagnie Française, and was signed in behalf of the owners by John S. Emery & Co., agents for the owners, and by John F. Brooks, agent for the Compagnie Française. As to the compensation for the ship's service, it was therein stipulated that the vessel should be paid, "for the charter or freight of said vessel during the voyage aforesaid, in the manner following, that is to say, sixteen dollars and fifty cents ($16.50) per thousand feet, freight measure, intake survey, for all the lumber delivered at Dakar and Sierra Leone, payable in United States gold or its equivalent, upon delivery of cargo, without discount or allowance. Vessel to pay her own port charges at Dakar and Sierra Leone." This instrument bears date at Boston, October 7, 1889. On the same 7th day of October, 1889,—but whether in fact before or after the execution of the charter party just mentioned does not appear,—a document was executed as follows:

John S. Emery & Co., Ship Brokers, No. 168 State Street.
(Cable address:
Emery, Boston.) Boston, Oct. 7, 1889.

We have this day chartered of John S. Emery & Co. the bark Tremont (now on passage from Philadelphia to Galveston) for a voyage from Ship Island, Miss., to Dakar and Sierra Leone, W. C. A., for a lump sum of fifty-nine hundred dollars ($5,900), and no deduction is to be made from said amount

in case of loss of part or whole deck load on passage to Africa. Vessel to take a full cargo of lumber under deck, and deck load not to exceed 25,000 feet. In consideration of J. S. E. & Co. making a C. P. with John F. Brooks at $16.50 per thousand feet, intake survey, board measure, for each and every thousand feet delivered, we agree to pay said Emery the difference between amount of freight collected by vessel at Africa and $5,900, amount of charter. Balance to be paid as soon as charterer receives advices of the delivery of cargo at Africa. All other conditions to be according to C. P. dated Oct. 7, '89, between John F. Brooks, agent, and John S. Emery & Co., agent for vessel.                                                    James & Abbot.

Witness the same: W. H. Randall, Jr.

The paper on which the instrument between the owners and the Compagnie Française was written is headed: "John S. Emery & Co., Ship Brokers, No. 154 State Street, Boston." This court holds that this was a charter, and by appropriate and sufficient reference to the other instrument, executed on the same day, and seemingly at the same place, embodied and adopted all the terms and conditions in that contained, saving only the matter of freight. The appellants contend that it was unilateral and inoperative; but though not signed in behalf of the ship or her owners, it was delivered to and accepted by them, and their ship entered upon its performance. The result will not be changed, if this document should be regarded and treated as a written admission by the defendants of a parol charter between the parties. It would then be a memorandum of the contract signed by the defendants, sufficient to meet the statute of frauds. It cannot be regarded simply as an agreement for a charter to be drawn and executed. If it were so considered, under the authority of The Tribune, 3 Sumn. 144, Fed. Cas. No. 14,171, it "amounted to a present charter party, notwithstanding a more formal instrument was contemplated." It does not purport to be an agreement for something to be done, but speaks of a past transaction, and begins: "We have this day chartered of John S. Emery & Co. the bark Tremont." This is an explicit admission and declaration that the contract had already been made, and it was for a lump sum of $5,900. James & Abbot consent to the subcharter to Brooks, for the Compagnie Française, at a less rate of freight than was payable under their own charter, and promise, notwithstanding such subcharter, to stand to and make good all the conditions and terms of their own contract; and while thus consenting to this modification of their own charter, in respect to the collection of freight from the purchasers of the cargo, they declare that all the other conditions of their own undertaking shall be according to the charter party of that day between Brooks and the agents of the vessel. A vessel may be chartered by parol. Muggridge v. Eveleth, 9 Metc. (Mass.) 236; Thompson v. Hamilton, 12 Pick. 425; Taggard v. Loring, 16 Mass. 336; The Phebe, 1 Ware, 268, Fed. Cas. No. 11,064.

If, as has been argued, this provision, saving its conditions, was for the protection of the contract between Brooks and Emery & Co., it was uncalled for and useless. But it is not difficult to understand why the contract and charter between Emery & Co., agents of the vessel, and James & Abbot, sellers of the cargo, was not so formally written out as that signed by Brooks and Emery & Co.

It was well understood that the captain of the vessel would need to have with him at Dakar and at Sierra Leone a copy of the charter by which he was to settle with the consignees of the charter at those ports. Hence that was written out fully, specifying everything. But the principal contract was between residents of Boston, or where communication could readily and quickly be had. There was and would be no necessity of examining or referring to it, on the coast of Africa, and labor and trouble were saved by the course pursued. A professional man, employed to draw all these contracts, would probably have followed another course. But all papers relating to the business of selling cargo, and chartering the vessel, and the subcharter, were drawn by business men, in an informal way; but they are intelligible and sufficient. We have no doubt that the charter between Emery & Co. and James & Abbot was made and completed before the other, between Emery & Co. and Brooks, was drawn up. If there was ever an agreement for a charter to be made, it must have been an agreement to make the subcharter with Brooks.

At the date of the contract the bark was on a voyage from Philadelphia to Galveston, Tex., with a cargo of iron. After a passage perhaps somewhat protracted, she arrived off the bar at Galveston, and was unable to pass over it, and into the harbor, on account of the state of the sea there. As soon as the sea subsided, and the weather became favorable, she went over the bar into the harbor without lightering any part of her cargo, which alone is sufficient, in the absence of contrary evidence, to show that she was not too deeply loaded for her voyage from Philadelphia. Without loss of time she was there discharged, and sailed for Ship Island to enter upon the performance of her charter. There is nothing in the evidence to show that her failure to reach Ship Island as early as was anticipated was caused by any fault of the ship or her officers or owners. She gave notice of her readiness for cargo, and began to take it in on the 16th of December, and did not finish loading till January 9th. The cargo was slightly less than 340,000 feet, to load which, at the rate of 20,000 feet per running day, Sundays only excepted,—the rate named in the charter,—required only to January 3d, or six days less than the time actually taken. For these six days, demurrage at the rate of $50 per day was due under the charter, unless the delay in loading was without the fault of the defendants. It is not an excuse for them that holidays and days when laborers would not work intervened. This, if true, was unfortunate for the charterers. But they, in their charter, excepted from running days "Sundays only," and they cannot be allowed the further exception of such or any other days. Nor is the proposition assented to that the ship was so in fault for not reaching Ship Island early enough to complete loading before the holiday season as to relieve and excuse the charterers for not loading her within the number of days contracted.

Another defense or excuse is set up, namely, that the captain did not tell the charterers how much more lumber would be required to complete his cargo. If that was not a matter as much

the duty of the shippers to know as of the master, they certainly did not offer a full cargo at any time in season for it to be loaded sooner than it was, and suffered no delay by the lack of information. Nor can they take any benefit on account of the breakdown in one of the lighters. No exception of that kind is found in the charter. It was their duty to provide suitable lighters. The cargo was to be delivered within reach of the ship's tackles. Until it was brought there the ship had no responsibility for it.

There was no error in the conclusion of the district court that the defendants are liable, but we cannot agree with that court as to the amount of liability. Demurrage for two days, amounting to $100, was allowed for time occupied and lost in the dispute about the form of the bills of lading, and in correspondence by telegraph between the captain of the bark and his owners, also for $17.07, expenses of the master for telegraphing, railroad fares, and noting protest. We think these items, making the sum of $117.07, with interest on so much, should not have been allowed.

Case remanded to the district court for a decree according to this opinion. The appellee allowed costs in this court.