## WASHINGTON MARINE CO. v. RAINIER MILL & LUMBER CO.

(District Court, D. Oregon. July 15, 1912.)

No. 4,963.

1. SHIPPING (§ 47*)—CHARTER—CONSTRUCTION—DISCHARGE OF CARGO.
   A provision in a charter of a steamer to carry timber, "cargo to be * * * taken from vessel at port of discharge by charterers or their agents," in connection with a further provision requiring the cargo to be "delivered as customary with steam schooners," did not require the charterers to unload the vessel, but to receive the cargo from her side, especially where that was the construction acted on by the parties.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 182, 183; Dec. Dig. § 47.*]

2. SHIPPING (§ 171*)—CHARTER—CONSTRUCTION—DEMURRAGE—"DEFAULT."
   In a provision of a charter party for the payment of demurrage "for each and every day's detention by default of charterers," the word "default" should be construed as meaning the failure to perform some duty imposed by the contract, and such failure only renders the charterer liable for demurrage.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 568; Dec. Dig. § 171.*
   For other definitions, see Words and Phrases, vol. 2, pp. 1928–1930; vol. 8, p. 7630.]

3. SHIPPING (§ 184*)—DEMURRAGE—EVIDENCE CONSIDERED.
   Evidence considered as to the demurrage which a shipowner was entitled to recover from a charterer for detention of the vessel in discharging beyond the lay days fixed by the charter party.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 596; Dec. Dig. § 184.*]

4. SHIPPING (§ 181*)—DEMURRAGE—BEGINNING OF LAY DAYS.
   A notice of readiness to load or discharge required by a charter party to start the running of the lay days is unnecessary and may be considered waived, where the charterer was ready and the work was commenced at once.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 589–592; Dec. Dig. § 181.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

5. SHIPPING (§ 181*)—DEMURRAGE—COMPUTATION OF TIME.

Where a Sunday intervenes between the expiration of the lay days for discharging a vessel and the time when the discharge is completed, it is to be counted as a day of detention.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 589–592; Dec. Dig. § 181.*]

6. SHIPPING (§ 171*)—DEMURRAGE—CONSTRUCTION OF CHARTER PARTY—"DAY BY DAY."

A provision of a charter party that the charterer shall pay demurrage "day by day" for detention of the vessel through his default does not require the owner to demand demurrage at the end of each day, but means one day after another or running days.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 568; Dec. Dig. § 171.*

For other definitions, see Words and Phrases, vol. 2, p. 1837.

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

In Admiralty. Suit by the Washington Marine Company, as owner of the steamer Washington, against the Rainier Mill & Lumber Company. Decree for libelant.

Snow & McCamant, of Portland, Or., for libelant.

Ralph R. Duniway, of Portland, Or., for respondent.

WOLVERTON, District Judge. This is a libel to recover demurrage for detention of the steamer Washington caused by the alleged failure of respondent to receive and take certain cargoes of lumber from the ship's side so as to enable the libelant to discharge the cargoes within the lay days specified in the charter parties under which the cargoes were carried; also, a small amount, to wit, $28.70, for wages of stevedores working overtime. The lumber was shipped to be delivered under two charter parties of date, respectively, March 12, 1907, and April 24, 1907. Demurrage is claimed for one-half day's detention of the steamer on each of two voyages made under the first, known as voyages 10 and 11, and, under the second, three days on each of two voyages, known as 12 and 13, being for $1,400 in the aggregate. The charter party of date March 12th provides, among other things:

"Cargo to be furnished to vessel at loading port, and taken from vessel at port of discharge, by charterers or their agents, furnished in three working days and taken in five working days."

That of April 24th:

"Cargo to be furnished to vessel at loading port, by charterers or their agents at the rate of not less than 150 M. feet per working day, and received at port of discharge in five (5) days, Sunday excepted."

And each of them stipulates:

"Lay days to commence at ports of loading and discharge immediately after notice, given in writing by the captain, that vessel is ready to receive or discharge cargo.

"For each and every day's detention by default of charterers, the charterers or their agents shall pay to the managing owners, day by day, in gold coin of the United States, demurrage at the rate of $200.00 per day.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Cargo shall be received within reach of vessel's tackle (which is construed to mean within 60 feet of vessel's rail) and delivered as customary with steam schooners."

The cargoes were shipped at Rainier, Or., and transported to Oakland and San Francisco, Cal.

On voyage 10 the steamer arrived at the dock April 29, 1907, at 1 a. m. and began discharging at 9 a. m. She finished discharging at noon of May 4th.

On voyage 11 she arrived at the wharf May 16th at 6:50 a. m., began discharging at 9 a. m., and finished on the 22d at noon.

Arrived at the wharf on voyage 12 June 3d at 10 p. m., began discharging June 4th at 9 a. m., and completed her work June 11th at 10:30.

The thirteenth voyage ended at the dock June 24th at 6 a. m., began discharging at 7, and completed July 1st.

Much testimony has been adduced; but the principal dispute as to fact relates to the manner of discharging the cargoes by the steamer Washington and the manner of taking the same away from the ship's tackle by the respondent.

[1] A question is suggested, under the charter party of March 12th, whether the respondent should not only receive the lumber at the ship's side, but also unload it from the ship. The clause (7) requiring interpretation is an unusual one in charter parties. It reads:

"To be * * * taken from vessel * * * by charterers."

Its literal rendering would seem to require the charterers to unload the vessel, or to take the lumber as found laden on the vessel. Clause 10, however, requires the cargo to be "delivered as customary with steam schooners." This, taken in connection with the way in which the parties to the charter parties themselves treated the stipulation, leads to the rendering which requires the charterers to receive the lumber at port of discharge as stipulated in the charter party of April 24th. Such was evidently the intention of the parties when they entered into the contract, and such is the reasonable intendment of the contract itself. This requires the vessel to unload the cargo and the charterers to receive the same from the ship's side or from within reach of her tackle.

[2] Controversy has arisen as to the significance of the language "detention by default of charterers," contained in the charter parties. The term "default" employed in that relation in charter parties signifies failure on the part of the charterers to do or perform some duty or act which they have stipulated or are bound in pursuance of their contractual relations to do or perform. The term cannot be so broadly interpreted as to include all manner of causes of detention or delay, whether arising from act or omission in the discharge of duty on the part of the charterers or not. In other words, the contract is not absolute that there shall be no detention beyond a certain day for any cause, but that there shall be no detention on account of the failure of the charterers to perform their contractual obligations with the vessel or its owners. 1,600 Tons of Nitrate of Soda v. McLeod, 61

Fed. 849, 10 C. C. A. 115; Crossman v. Burrill, 179 U. S. 100, 21 Sup. Ct. 38, 45 L. Ed. 106.

[3] The controversy as to the fact centers about the charge on the part of the charterer that the vessel was at fault in the manner in which it persisted in discharging the lumber over the ship's side and lowering it upon the dock or wharf, and the charge on the part of the vessel that the charterer was derelict in not removing the lumber from the wharf with reasonable dispatch so as to afford room for disposing of it as fast as it could be taken from the ship. The especial complaint of the charterer is that the winch in use upon the Washington was defective and out of order much of the time, so that the operator was unable to control the sling-loads of lumber as they were taken from the vessel, and to lower them slowly upon the dock, so that they could be swung or directed, by the men on the dock when coming within their reach, to the desired place for landing; that the slings were lowered by irregular starts, sometimes running down rapidly and for uncertain distances, and not infrequently striking the wharf with such violence as to break up the lumber, and withal, rendering it dangerous for the men on the wharf to work about the sling until it was fully landed; and that thus the men were greatly delayed in removing the lumber from the wharf. Hence it is urged that whatever delay was encountered in unloading the Washington was caused by the bad operation of the winch and the irregular manner of unloading the lumber from the vessel.

I am convinced that the winch did work badly, and that this contributed to the delay and detention of the vessel, but that it was not the whole cause of such delay and detention. The lumber was sorted on the wharf, as it came off the vessel, before being carted away to the yard. To allow this to be done with the greatest convenience and dispatch, the lumber was delivered in three different places on the wharf, which could be done by swinging the hoisting appliance to accommodate it to the place of landing. It is disputed that the lumber was so discharged, but I am impressed that it was. The stevedores at work on the wharf in separating and removing the lumber were therefore unable to take it away as fast as it could be unloaded, and the greater part of the delay arose by reason thereof. This is also vigorously disputed; but, without going into the evidence, it is sufficient to say it has been shown to my satisfaction that the lumber was allowed to accumulate upon the wharf from time to time, which materially impeded the ship in unloading. Some of the wharves or docks where the unloading was done, afforded limited floor space for the work, and, unless the lumber was cleared away as delivered, the vessel would be delayed for want of room. The respondent, to my mind, did not provide sufficient men to relieve the accumulation as it ought, and must be held responsible for by far the greater part of the delay and detention of the Washington beyond the stipulated lay days. Such delay and detention are properly chargeable to its default under the terms of the charter parties.

But it is insisted that, if any demurrage is properly chargeable to

198 F.—10

respondent, it was settled or waived prior to loading for voyage 13. The loading evidently began for this voyage at Rainier on the afternoon of July 15th. The Washington was leaving Astoria for Rainier at 8 a. m. Of this Charles E. Fowler, who was representing the libelant, was advised by wire at Seattle. Fowler says that the ship arrived at Rainier in the afternoon, and in the afternoon Ben W. Reed, who represented the respondent, telephoned Fowler at Seattle that he would not load the ship until the demurrage was waived or settled, and a meeting between them was arranged to be had in Portland upon the subject. The exact time of the meeting is a matter of dispute. It is quite probable that Fowler came over to Portland on the evening of the 15th, and that Reed came up from Rainier on the same evening, but that they did not meet until the next morning. Reed testifies that at that meeting the demurrage charges were waived by Fowler, whereupon he directed his men to proceed with loading the boat. Fowler testifies that there was no ultimate adjustment of the matter, but that he assured Reed that they would come to some amicable settlement. He had given Reed a like assurance by letter as to one item of the demurrage. I am inclined to the view that the settlement was had as Reed testifies, although I think the boat was in the process of loading at the time. The parties came to Portland expressly on the one item of business about which they were not agreed, and it is scarcely probable that the matter was left as wide open after the conference as it had been before, and that no settlement whatever was reached. In this connection, it is suggested that, if the settlement was agreed upon, there was no consideration to support it; the respondent having entered upon the work of taking on cargo. The libelant, however, was willing at that time to adjust the matter by waiving the demurrage, and Reed was led to believe that it was so adjusted, and that future transactions would be governed accordingly, and libelant should not now insist upon recalling its agreement. This affects only voyages 10 and 11, as demurrage had been claimed only on these at the time of the agreement, and, considering that the half day's detention in each case was short, beginning at 9 a. m. and ending at noon, and that libelant was somewhat at fault in the entailment of the delay, I will disallow the claim in toto for these voyages.

As to voyage 12, the lay days ran up to June 9th, at 9 a. m. That day being Sunday, it could not be counted as a day of detention, as the lay days had not fully expired. Considering again the participating fault of the libelant in the delay, I will allow one day's demurrage on this voyage, three days on voyage 13, and nothing for the extra expense claimed as paid laborers for overtime. The libelant is therefore entitled to recover from respondent the sum of $800.

[4] A question has arisen respecting the notice to be given under the stipulations of the charter parties of the ship's readiness to begin discharging her cargo. I find that no notice was given in that respect as it pertains to any of the voyages, but I further find that the respondent was ready with its men to receive the lumber at the time the ship began discharging in each instance, and that this fact constituted

a waiver of the notice. 268 Logs of Cedar, Fed. Cas. No. 14,295. The lay days began only with the hour that the unloading began.

[5] Sunday should be counted as a day of detention after the lay days have expired. James v. Brophy, 71 Fed. 310, 18 C. C. A. 49; The Oluf (C. C.) 19 Fed. 459.

[6] A point is made that the libelant should have demanded demurrage at the end of each day's detention; it being claimed that the language "shall pay to the managing owners, day by day," means that the payment shall be made each day as the detention continues, and that, if no demand is made for demurrage each day, it is waived. The phrase "day by day" simply means one day after another, or running days, to continue until the detention has ceased. The Oluf, supra.