**ROMNEY S. S. CO., Limited, v. ARCHIBALD McNEIL & SONS CO., Inc.**

(District Court, D. Maryland. May 4, 1921.)

No. 726.

Shipping ☞178—Railroad strike, which only partially interrupted transportation, held not to excuse charterer's delay in furnishing cargo.

 A charterer of a vessel to carry a cargo of coal, who was excused by the charter party from demurrage for delay occasioned by strikes, is liable for delay in furnishing the cargo for the vessel, notwithstanding a strike on the railroads which were to transport the coal, where that strike was only partial, and did not prevent the railroads from hauling more coal to the port than had ever been done before, so that the delay was caused by the unusual conditions in the coal industry, which were known to both parties at the time the charter party was made.

In Admiralty. Libel by the Romney Steamship Company, Limited, against the Archibald McNeil & Sons Company, Incorporated, to recover demurrage. Decree rendered for libelant.

The charter of the Apsley was on the Washington coal form of July, 1919, containing the provisions:

"3. The act of God, restraint of princes, rulers, and people, fire, and all and every other dangers and accidents of the seas, rivers, and steam navigation, of what nature and kind soever, riots, and strikes always mutually excepted."

"4. * * * Lay days to commence from 48 hours after readiness to load, whether berthed or not berthed, and master has given notice in writing of such readiness. * * * Should the steamer not be ready for cargo at her loading port on or before June 15, 1920, the party of the second part, or his agent, may at his option cancel this contract of affreightment at any time not later than the day of the steamer's readiness to load. Cargo to be loaded into steamer with customary dispatch, in accordance with the rules of the

port of loading, but in no case at less than 1,500 tons per running day, Sundays and legal holidays excepted. Any time lost at docks through riots, strikes, lockouts, or disputes between masters and men, or by reason of floods, frost, fogs, or storms, or by reason of accidents to ship's tackle, winches, equipment, or other disability of the ship which prevents her taking cargo, that occasions a stoppage of delivery of coal to said steamer is not to be computed as part of the loading time, unless any cargo be actually loading during such time. In the event of any stoppage or stoppages arising from any of these causes and continuing for the period of six (6) running days from the time when the steamer is ready to load, the party of the first part (meaning 'owners') may, at its option, terminate this contract, without prejudice, however, to any rights of action which it may have: Provided, however, that such stoppage occurs before any cargo shall have been loaded on board the steamer."

"6. Also that for each and every day said steamer is on demurrage at either loading or discharging port the party of the second part, or agent, shall pay to the party of the first part, day by day, demurrage at the rate of forty-eight cents ($.48) per net registered ton of steamer per running day, or pro rata for part of a day. Dispatch money to be paid by steamer at the rate of sixteen cents ($.16) per net registered ton of steamer per lay day saved or pro rata for part of a lay day saved, nonreversible."

This charter party effective, whether permit for cargo granted or not granted.

Charles R. Hickox (of Kirlin, Woolsey, Campbell, Hickox & Keating), of New York City, and Stuart S. Janney (of Janney, Stuart & Ober), of Baltimore, Md., for libelant.

George A. McLaughlin (of Peale & McLaughlin) and T. Catesby Jones (of Harrington, Bigham & Englar), both of New York City, and George W. Whip (of Lord & Whip), of Baltimore, Md., for respondent.

ROSE, District Judge. This is one of ten cases, in every one of which a steamship owner is suing either for delay in furnishing a cargo of coal, as required by charter, or for failing altogether to supply it. In all there are ten libelants, one in each case. They are all corporations, six of them of Great Britain, two of Spain, one of Greece, and one of Japan. There are but three respondents. One of them figures in five suits, another in three, and the third in two. While the controlling questions are not the same in all, it is necessary for a clear understanding of any of them to have in mind the conditions which prevailed and to an extent controlled the water-borne coal trade of Baltimore during some part or another of the five months between April 1 and August 31, 1920. It was therefore agreed that testimony taken in any one of these cases should, so far as applicable, be considered as having been taken in any or all of them.

In the one now under consideration, the claim is for demurrage. The steamship involved, the Apsley, reported on June 2d, and by the terms of the charter loading should have been completed by June 9th, but it was not in fact finished until June 13th. The charterer says that the cargo would have been loaded in time, had it not been for the so-called outlaw strike of switchmen on the Baltimore & Ohio, the Pennsylvania, and the Pittsburgh & Lake Erie railroads, on which were located the mines from which it procured its coal. The charter provided that—

"Any time lost at docks though riots, strikes, lockouts, disputes between masters and men, * * * that occasion a stoppage of delivery of coal to said steamer, is not to be computed as part of the loading time."

In the spring of 1920 coal was very high in Europe, and, by comparison, much cheaper here. It looked as if a handsome profit could be made by exporting it, and there was a rush to charter ships to carry it. Consequently, far more of them came to Baltimore for coal than at any previous time in the history of the port, with the possible exception of the preceding October. The roads which bring it to Baltimore from the mines were, in common with the rest of the railroad systems in this portion of the country, by no means in the best condition for promptly carrying large volumes of freight. On the 1st of April, 1920, the war had been over less than 18 months. The roads had just been taken back from government operation. Their equipment was far from being as good or as ample as it once had been. An unusually severe winter had added to their difficulties, and to the disorganization and congestion of traffic, by which they were embarrassed, and their facilities were further overstrained by the demands of an unusual activity in business throughout the country. All these conditions were well known to everybody when the charter was made.

Not long after April 1st the strike upon which the charterer seeks to rely broke out first at Chicago and then at other places, and in varying and fluctuating degrees continued to annoy the railroads until July, but there was never any time at which it was general. It never completely tied up traffic anywhere for more than a very few days at a time. In spite of it, and of all the other troubles of the railroads, freight continued to move in large volume. In June, when the Apsley reported herself ready for cargo, more coal was brought into Baltimore and loaded over its piers into ships than in any preceding month in its history; October, 1919, alone excepted.

It is unnecessary in this particular case to consider any doubtful questions of law, for respondent has failed to show that its tardiness in supplying the cargo was the result of a strike in any such direct sense as is necessary under any of the authorities to excuse it from its charter obligation. The truth is that the railroads, in spite of all the handicaps they suffered by strikes and other causes, were, so far as coal was concerned, doing far better than their previous average best. Charterers may not take advantage of their own mistakes in arranging for more shipments than can be promptly loaded. W. K. Niver Coal Co. v. Cheronea S. S. Co., 142 Fed. 403, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126.

The owner is entitled to demurrage at the charter rate.