BERWIND–WHITE COAL MINING CO. v. SOLLEVELD, VAN DER MEER & T. H. VAN HATTUM'S STOOMVAART MAATSCHAPPIJ.

(Circuit Court of Appeals, Fourth Circuit. January 18, 1926.)

No. 2412.

**1. Shipping ⬅️171.**

Demurrage, having commenced to run, is not suspended by occurrence of event within exceptions of loading clause.

**2. Shipping ⬅️179—Demurrage, which commenced to run before fuel administrator's order of October 31, 1919, held not suspended pending obtention of permit to load.**

Demurrage on vessel, which had commenced to run before fuel administrator's order of October 31, 1919, became effective, *held* not suspended pending obtention of permit to load.

**3. Shipping ⬅️179—Restraint in loading coal, arising from fuel administrator's order, held not to relieve charterer from liability for demurrage.**

Governmental restraint, in form of order of fuel administrator, of loading of coal vessel *held* not to relieve charterer from liability for demurrage, where, before order became effective, charterer had ample coal available to load, and failed to do so.

**4. Shipping ⬅️179.**

Governmental restraint to excuse charterer's nonperformance of contract must be proximate cause thereof.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Libel in personam by Solleveld, Van Der Meer & T. H. Van Hattum's Stoomvaart Maatschappij against the Berwind-White Coal Mining Company. Decree for libelant, and libelee appeals. Affirmed.

Harrington Putnam, of New York City (Hughes, Little & Seawell, of Norfolk, Va., and Leo J. Curren, of New York City, on the brief), for appellant.

Charles R. Hickox, of New York City (Edward R. Baird, Jr., of Norfolk, Va., and Earl Appleman, of New York City, on the brief), for appellee.

Before ROSE and PARKER, Circuit Judges, and WATKINS, District Judge.

PARKER, Circuit Judge. This is an appeal from a final decree in admiralty in personam in favor of the owner of the steamship Oostdijk against the Berwind-White Coal Mining Company, the charterer of said vessel, for demurrage amounting to $109,-100.70, with interest and costs. The charter party was executed October 2, 1919. By its terms the vessel was chartered to carry a bulk cargo of coal of about 3,500 tons from Norfolk or Newport News to Buenos Aires or Montevideo, one port only, merchants option for a freight of $15 per ton. The vessel arrived at Newport News on October 27, 1919, and on October 28th, at 7 a. m., custom house formalities had been fulfilled; she was in all respects ready to load cargo; and notice of readiness was served on the coal company's agent. The vessel was not loaded, and the lay days provided in the charter expired at 4:36 p. m. October 30th. The coal company admits that the vessel went on demurrage on October 30th, but claims that demurrage was suspended at midnight on October 31st because of an order of the United States Fuel Administration, which, it contends, made illegal the export of coal contemplated by the charter until a permit was secured on January 10, 1920. The vessel completed loading, and sailed from Newport News January 13th. The coal company admits its liability for demurrage amounting to $7,492.11, being for the admitted detention before October 31st at Newport News, the time in January after receiving the license to load, and for a half day's delay at Buenos Aires; and the only question in the case is whether demurrage was suspended as a result of the order of the Fuel Administration. If it was not

suspended, then it is conceded that the decree of the court below was correct.

The pertinent provisions of the charter party were as follows:

"3. The act of God, restraint of princes, rulers and people, fire and all and every other dangers and accidents of the seas, rivers and steam navigation of what nature and kind soever, riots and strikes always mutually excepted.

"4. It is agreed that the lay days for loading shall be as follows: Commencing from time steamer is ready to load and custom house formalities are fulfilled whether berth or cargo available or not available.

"Cargo to be loaded as follows:

"1 ton to 3,000 tons cargo capacity 2 running days.

"3,001 tons and upward cargo capacity to be loaded at the rate of not less than 1,500 tons per running day for entire cargo.

"Sundays and legal holidays to be excepted; it being understood that the vessel be loaded within specified lay days or charterers to pay for any time lost. If Sundays and legal holidays used same to count as half lay days unless steamer be on demurrage, in which case to count as full days.

\* \* \*

"Any detention in loading port after loading is completed, unless caused by default of ship, shall also count the same as time occupied in loading; owners to have a lien on cargo for all demurrage and expenses of loading and of discharging and charterers to pay the same.

"Any extra expense incurred by reason of working steamer on Sundays or holidays at loading port shall be for the account of the charterers and any extra expense incurred by reason of working the steamer on Sundays or holidays at port of discharge shall be for the account of the cargo. However, should steamer be on demurrage when such extra expense is incurred, whether at loading or discharging port, such extra expense to be borne by cargo.

"5. Also, that for each and every day on demurrage the party of the second part, or agents, shall pay to the party of the first part at the rate of forty-eight (48c) cents United States gold per gross registered ton per day, and for each lay day or part of lay day saved despatch money at the rate of sixteen (16c) cents United States gold, per gross registered ton per day, shall be allowed the party of the second part, or agent. For the purpose of calculating despatch or demurrage any lay days or part of lay days

11 F.(2d)—6

saved at loading port shall be added to the time allowed for discharging or vice versa."

The facts with regard to the order of the Fuel Administration and the failure of the respondent to furnish the vessel with cargo of coal were as follows: On October 31, 1919, the Fuel Administrator of the United States government issued an order, effective at midnight October 31st, by which the Director General of Railroads was instructed to make diversion of coal in the possession of the railroads, and to provide for its distribution among the various consumers of coal according to a certain preference list. This order did not prohibit the export of coal, but made it necessary to obtain the consent of the fuel administration before coal could be moved over the railroads from the mines to the seaboard for export. It did not interfere in any way with coal not in the possession of the railroad companies. On December 27th an order was issued by the Fuel Administration establishing the embargo and permit system for handling coal at Norfolk and Newport News for export, and thereafter permits were required before coal could be loaded for export. At no time during this period was the shipping of coal from Newport News entirely prohibited. On the contrary, between October 31st and January 13th, vessels received at that port 198,515 tons, of which 131,888 tons were for foreign shipment, and almost one-fourth of which was loaded by respondent. During the same period 411,903 tons were loaded at Norfolk; 283,595 tons being for export and 18,181 tons being loaded by respondent.

At the time the Oostdijk reported for cargo on October 28th respondent had available for loading vessels at Newport News 10,725 tons of coal; on October 29th 4,675 tons; on October 30th 1,760 tons; and on October 31st 4,895 tons. If respondent had ordered a cargo of this coal loaded on the Oostdijk, it would have been loaded at any time before midnight of October 31st. But it appears that, instead of loading the Oostdijk, respondent loaded the coal into other vessels. On October 28th respondent had at Norfolk 10,990 tons of coal; October 29th 7,986 tons; October 30th 4,236 tons; and October 31st 2,684 tons. On November 1st it had at Norfolk 7,088 tons, whereas the tonnage of the waiting vessels there was only 4,900 tons. There were 15 vessels loaded by respondent at Newport News between October 28th and January 13th. Of these, 3 arrived ahead of the Oostdijk; one on the same day and 11 after the Oostdijk. At Norfolk during the same period 11 vessels were loaded, one of

which arrived on the same day as the Oostdijk and 10 afterwards.

On November 1st respondent's agent at Newport News wrote a letter to the master of the Oostdijk, advising him that the government had issued orders that no cargo vessels be loaded, and that respondent would not be responsible for any delay, detention, or demurrage on the vessel caused by the government order. On November 4th, however, respondent's attorneys wrote the Director General of Railroads, requesting that 6 vessels named, including the Oostdijk, be allowed to load and sail, stating that the Oostdijk and another were "already under demurrage," and concluding: "We feel that consideration should be given to the great hardship which the charterers of these vessels will experience and which has already begun by reason of demurrage." In a letter to the Director General under date of November 13th respondent's attorneys again referred to the Oostdijk as "under demurrage."

It is not necessary that we enter into a discussion of the questions raised with respect to the interpretation of the loading clause of the charter party or that we decide whether the exceptions specified in the vis major clause constitute exceptions to the obligations of the loading clause. The position of respondent that the running of demurrage was suspended by the alleged governmental restraint cannot be sustained, even if respondent's interpretation be accepted, for two reasons: First, because the vessel was admittedly on demurrage at the time the alleged restraint became operative, and the running of demurrage would not be suspended by the occurrence of events which would suspend the obligation to load, and, second, because the alleged restraint was not the proximate cause of the delay in loading.

[1, 2] As to the first proposition, the rule is that, after demurrage has commenced to run, it will not be suspended by the occurrence of an event within the exceptions of the loading clause. Washington Marine Co. v. Rainier Mill & Lumber Co. (D. C.) 198 F. 142; The Oluf (C. C.) 19 F. 459; Lindsay v. Cusimano (C. C.) 12 F. 504; James v. Brophy, 71 F. 310, 18 C. C. A. 49; Baldwin v. Sullivan, 36 N. E. 1060, 142 N. Y. 279; Ulster Brick Co. v. Murtha, 154 N. Y. S. 834, 169 App. Div. 151; Scrutton on Charter Parties and Bills of Lading (11th Ed.) 342; Poor on Charter Parties 349; Carver, Carriage by Sea (5th Ed.) 258c. In MacLachlan's Law of Merchant Shipping (5th Ed.) p. 589, it is said: "Unless the contrary be clearly stipulated, time runs continuously for the payment of demurrage without regard to day or night or nonworking days."

Carver on Carriage by Sea, supra, states the rule as follows: "When a ship is on demurrage, the time for which demurrage has to be paid generally runs on continuously; the exceptions to the charterer's obligation usually cease to apply."

The author last cited states that whether demurrage runs on continuously may depend on the terms of the demurrage clause, and the case of Lilly v. Stevenson, 22 Sess. Ca. (4th) 278, is cited where the demurrage clause excepted detention arising from lockouts, strikes, etc. In this case, however, there is no exception to the obligation to pay demurrage. On the contrary, it is expressly provided that the lay days shall commence when the vessel is ready to load and custom house formalities have been complied with, whether cargo is available or not available; that the charterer shall pay for all time lost; and that detention in loading port after loading is completed shall count the same as time occupied in loading, "unless caused by default of ship." We think that the attorneys for respondent correctly interpreted the situation when they wrote to the Director General of Railroads on November 4th, and again on November 13th, that the Oostdijk was "under demurrage."

[3] The other insuperable objection to the suspension of the demurrage is that the proximate cause of the delay in loading the ship was not governmental restraint, but the acts of respondent itself. When the ship gave notice of her readiness to take on cargo, there was no governmental restraint, and charterer had the coal with which to have loaded her either at Newport News or at Norfolk. This condition continued throughout the lay days and for more than a day after demurrage had commenced to run. Not until midnight of October 31st did the governmental order become effective diverting coal in possession of the railroad companies; and, even after that, and prior to the loading of the Oostdijk, respondent continued to export large quantities of coal. This coal was loaded on other vessels; 15 being loaded at Newport News and 11 at Norfolk. Twenty-one of these ships arrived in port after the Oostdijk. Some of them were loaded in preference to the Oostdijk because of the policy of the Fuel Administration in granting permits for the export of coal to Cuba and certain other countries. Why others were given preference over the Oostdijk does not appear, but certain it is that respondent will not be heard to say that the

delay in loading was caused by governmental restraint, when it appears without contradiction that before the order of the Fuel Administration became effective respondent had ample coal to furnish a cargo to the Oostdijk in accordance with the terms of the charter party and failed to do so. As said by Judge Rose in Western Counties Shipping Co. v. Archibald McNeil & Sons Co., Inc. (D. C.) 273 F. at 299, "it had ample time to load the ship before the order in question could have hampered it."

[4] In order that governmental restraint shall excuse performance of his contract on the part of the charterer, the restraint must have been the proximate or distinguished from the remote cause of such failure. Hellenic Transport S. S. Co. v. Archibald McNeil & Sons Co. (D. C.) 273 F. 290, and Canute S. S. Co. v. Johnston (C. C. A.) 288 F. 848; Romney S. S. Co. v. Archibald McNeil & Sons Co. (D. C.) 273 F. 287; W. K. Niver Coal Co. v. Cheronea S. S. Co., 142 F. 403, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126; Canute S. S. Co. v. Diamond Fuel Co. (D. C.) 273 F. 301.

What was said by Judge Rose in the Hellenic Case, supra, covers the point involved here: "In order that the contingencies specified in them [excepting clauses] shall constitute a good defense, performance must have been thereby rendered in a practical sense impossible, illegal, or dangerous. * * * It is not sufficient that the happening of one of them adds materially to the * * * embarrassment of the parties relying on it, if nevertheless it is still possible to perform. * * * If by itself it [the restraint] could not have prevented performance, it will not excuse merely because, in combination with nonexcepted clauses, it did so. * * * Still more clearly is it settled that it will not relieve from liability merely because its happening prevented the party relying upon it from getting his cargo for the ship from the source at which he had planned to obtain it, unless that was, by the terms of the charter, or in the contemplation of the parties at the time it was made, or by the well-established course of trade, the only source from which he could have been expected to get it."

Certainly the respondent has not brought itself within the rule as here correctly laid down.

For the reasons stated, we are of the opinion that the decree of the learned District Judge was correct, and same is accordingly affirmed, with costs.

Affirmed.