HELLENIC TRANSPORT S. S. CO. v. ARCHIBALD McNEIL & SONS CO., Inc.

(District Court, D. Maryland. May 4, 1921.)

No. 724.

1. Shipping ☞52—Government restrictions on transportation of coal for export held not to excuse charterer's failure to furnish cargo.

An order of the Interstate Commerce Commission forbidding transportation of coal for export without a special permit, made for the purpose of insuring a sufficient supply for New England, which cut down the quantity of coal for export by only one-eighth and did not prevent substantially the normal number of vessels from being loaded, does not excuse the charterer's failure to furnish the cargo, which was due rather to the unprecedented demand for export coal which caused the Commission's order, and which did not prevent other shippers, who had no permit for transportation, from purchasing coal for their cargoes at the port.

2. Shipping ☞52—Government prohibition excuses charterer, though he could not have furnished cargo anyway.

The prohibition of the export of coal by the government excuses, under the restraint of princes clause, the failure of a charterer to furnish the cargo as required by the charter, even though the charterer would have been unable to furnish the cargo in absence of such prohibition.

3. Shipping ☞175—Charter held to impose on charterer risk of delay in getting ship to berth.

A provision in the charter party that the time for loading was to count from the master's notice of readiness to load, whether the steamer was in berth, or not, imposes on the charterer, not on the owner, the risk of delays in getting a berth.

4. Shipping ☞39—Interlineation in printed charter party prevails over inconsistent printed provision.

A typewritten interlineation in the charter party must be given its natural meaning, even though such a construction may limit the terms of some of the printed clauses or be inconsistent with them, since the minds of the parties were specially directed to the matter with which the interlineation dealt.

5. Shipping ☞52—Contingency provided against by charter must render performance practically impossible.

In order that the contingencies specified against in the charter party shall constitute a good defense to a libel for the charterer's failure to furnish the cargo, the charterer's performance must have been thereby rendered in a practical sense impossible, illegal, or dangerous; it being insufficient that the happening of one of them adds materially to the difficulties and embarrassment of the charterer.

6. Shipping ☞52—Restraint of princes, excusing charterer, must be proximate cause of failure.

While the restraint of princes, which will excuse the charterer's failure to furnish a cargo within the terms of the charter party, need not have been directed against the ship or the goods, but may have had other objects, it must have been the proximate cause of the failure, as distinguished from the remote cause, and if by itself it could not have prevented performance it will not excuse nonperformance merely because, in combination with nonexcepted causes, it did so.

7. Shipping ☞52—Restraint in getting cargo to ship excuses failure only if it was unobtainable from another source.

The restraint of princes clause in a charter party will not excuse the charterer's failure to furnish a cargo, where the restraint imposed was

on the transportation of the cargo for the ship from the source at which the charterer had planned to obtain it, unless that source was, by the terms of the charter or in the contemplation of the parties at the time it was made, or by the well-established course of trade, the only source from which the charterer could have been expected to get the cargo.

**8. Shipping ⬤⟲58 (2)—Party seeking to weaken binding effect of charter has heavy burden of proof.**

It is no light matter to weaken the binding force of mercantile contracts, and the burden is heavily on him who asks that it be done.

In Admiralty. Libel by the Hellenic Transport Steamship Company against the Archibald McNeil & Sons Company, Incorporated, to recover damages resulting from the charterer's failure to furnish a cargo of coal for the ship. Decree rendered for libelant.

The charter of the Iolcos was on the Americanized Welsh form, 1914, containing these provisions:

"3. Steamer to load as customary and in turn with other steamers, but in no case at less than fifteen hundred (1,500) tons per running day, Sundays and legal holidays excepted. Time for loading to count from seventy-two (72) hours after master has given written notice of steamer's readiness to load to charterers on their agents, whether steamer is in berth or not; such notice to be given between business hours of 9 a. m. and 5 p. m., or 1 p. m., on Saturdays. Any time lost through riots, strikes, lockouts, or any dispute between masters and men, occasioning a stoppage of pitmen, trimmers, or other hands connected with the working or delivery of the coal for which the steamer is stemmed, or by reason of accidents to mines or machinery, obstructions on the railway or in the docks, or by reason of floods, frosts, fogs, storms, or any cause beyond the control of the charterers whatever, not to be computed as part of the loading time (unless any cargo be actually loaded during such time). If detained longer, charterers shall pay demurrage at the rate of forty-eight (48) cents per net registered ton of steamer per running day or pro rata for part thereof. If any dispute or difference should arise under this charter, same to be referred to three parties in the city of New York, one to be appointed by each of the parties hereto, the third by the two so chosen, and their decision, or any two of them, shall be final and binding, and this agreement may, for enforcing the same, be made a rule of the court."

"7. The act of God, the king's enemies, restraints of princes and rulers, and perils of the seas excepted; also fire, barratry of the master and crew, pirates, collisions, strandings, and accidents of navigation, or latent defects in, or accidents to, hull and/or machinery, and/or boilers, always excepted, even when occasioned by the negligence, default, or error in judgment of the pilot, master, mariners, or other persons employed by the shipowner, or for whose acts he is responsible, not resulting, however, in any case from want of due diligence by the owner of the ship or by the ship's husband, or manager. The owners shall not be liable for any delay in the commencement or prosecution of the voyage due to a general strike or lockout of seamen or other persons necessary for the movement or navigation of the vessel. Charterers not answerable for any negligence, default, or error in judgment of trimmers or stevedores employed in loading or discharging the cargo. The steamer has liberty to call at any ports in any order, to sail without pilots, to tow and assist vessels in distress, and to deviate for the purpose of saving life or property, and to bunker. It is also mutually agreed that this shipment is subject to all the terms and provisions of and all the exemptions from liability contained in the act of Congress of the United States, approved on the 13th day of February, 1893, and entitled 'An act relating to navigation of vessels,' etc."

---

⬤⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Janney, Stuart & Ober, of Baltimore, Md., for libelant.
Lord & Whip, of Baltimore, Md., for respondent.

ROSE, District Judge. In this case the steamship Iolcos, belonging to the Hellenic Transport Steamship Company, a Greek corporation, was on June 9, 1920, chartered to the Archibald McNeil & Sons Company, Incorporated, to carry coal to Europe. When the ship reported at Baltimore, the charterer refused her, and she was after some delay rechartered at a much lower rate. Her owner seeks to recover the resulting loss.

The original charter was on what is known as the Americanized Welsh form, 1914, to which the parties made various amendments. The charterer defends under its third and its seventh articles, which excuse performance when failure is due to strikes or to the restraint of rulers. Before the ship arrived here, the charterer had told the owner that one or the other or both these causes would probably keep it from furnishing a cargo, but refusal to accept the ship was in the end based upon the second of them, and upon it alone. It is of no moment whether the charterer thereby precluded itself from thereafter relying upon the strike clause, for the labor disturbance set up in its answer is the same which has been described in the opinion this day handed down in No. 726, Romney S. S. Co., Ltd., v. Respondent Now at the Bar, 273 Fed. 287, and which, for the reasons therein stated, would not in any event have constituted a sufficient defense. To deal intelligently with the contention that a restraint of rulers prevented the loading of the ship, it is necessary to take up the story of Baltimore's coal trade where the opinion above mentioned dropped it.

The winter of 1919–20 had been in New England, as in many other parts of the country, one of unusual severity. To replenish its exhausted fuel supply was difficult, and many of its industrial and public services were on the verge of an enforced shutdown. The unusual industrial activity was still general throughout the country. The demand upon the railroads continued great, and they were in poor condition to respond. Full use could not be made of the water routes, for, although the tonnage under the American flag was far greater than it had ever been before, a variety of causes, including the great demand for ships to take coal to Europe, had so raised rates that from this section of the country it was cheaper to ship to New England by land than by sea.

The Interstate Commerce Commission felt that immediate action was required in consequence of the shortage of equipment, congestion of traffic, and other emergencies existing in this section of the country from which New England gets coal, and that it should use the powers conferred by paragraph 15, added to section 1 of the Interstate Commerce Act by section 402 of the Transportation Act of February 28, 1920 (41 Stat. 476). Accordingly, on the 19th of June, it issued what is known as Service Order No. 6, hereinafter referred to as "S. O. 6," to become operative on June 24th. In substance, S. O. 6 required all railroads, hauling bituminous coal to any tidewater transshipment pier

from Charleston, S. C., north, to give preference and priority to that consigned to one Storrow for transshipment to New England, and to attain that end the railroads were directed not to furnish cars to carry that kind of coal to tidewater, except upon permit from a designated agent of the Commission appointed under the authority given by paragraph 17, also added to the first section of the Interstate Commerce Act by the section of the Transportation Act already mentioned. Such permits were not to be granted unless the shipper or consignee would be able to load the coal at the port of transportation shipment without delay to the rail equipment; they were to be issued whenever the destination of the water movement of the coal was a United States coastwise port. If it was bound elsewhere, the permit was not to be given, unless the agent was satisfied that it would not impede the intended preference and priority. Each of the railroads was directed to establish such rules and regulations for loading vessels at the piers and for unloading or dumping cars as would effect the desired preference and priority.

Upon the going into effect of S. O. 6, the charterer made prompt application for a permit to bring forward coal for the Iolcos, as well as for a number of other vessels under charter to it. It was not until July 7 that any permits for the movement of export coal to Baltimore were issued, and for some undisclosed reason none was ever granted for the shipment of coal for the Iolcos. When, on July 13, that ship reported herself ready for loading, the charterer refused her. The owner declined to admit its right to do so, and warned it that it would be held for all resulting damages, costs, and expenses. In spite of S. O. 6, the owner was on July 23 able to recharter her to carry coal to Denmark or Gothenburg, Malmoe range, at $14 a ton. The rate to have been paid under the original charter here in suit had been $19 if the ship was ordered to a western Mediterranean port, or $17 if it was sent to one in the Bordeaux-Rotterdam range.

The charterer says that, under the well-known and long-established custom of the port of Baltimore, it had the right to wait until the ship was nearly due there before it started to forward coal for it from the mines. Randall v. Sprague (D. C.) 74 Fed. 247. It would have been unreasonable for it to have put coal for this purpose on the cars before June 24, and indeed against the public interest, in view of the congested condition of tracks, terminals, and rolling stock then existing, and at no time after that date, and until the rechartering of the ship, was it able to obtain the permit required by S. O. 6. It has offered evidence that it had the coal, or had perfected arrangements for procuring it, and that inability to ship from the mines to tidewater was the only reason why the ship was not loaded as the charter contemplated. Upon this showing it insists that the loading was prevented by a restraint of rulers, and that therefore it is not responsible for any loss which the owner may have suffered in consequence. The latter replies that the ship would have been bound to take any coal which the charterer chose to tender to it. It could not have inquired whether the offered cargo came from the charterer's own mines, whether it had

been purchased from some one else before it was placed on cars, or whether it had been bought after it was moved forward or even subsequently to its reaching tidewater. It is common enough for coal exporters to buy their cargoes from those having the article in cars at or near Baltimore, although the number of those so procured doubtless constitutes a small proportion of the aggregate leaving this port.

The evidence seems to show that, even during the time when S. O. 6 was in force, people who had had no coal on wheels before June 24, and who obtained no permits to send it forward after that date, got it somewhere and loaded foreign-bound ships with it. Precisely how they managed it is not made clear. Very possibly it was through some shifting of credits in the coal exchange pools, for when S. O. 6 was later revoked by Service Order No. 11, as is stated with more particularity in the opinion in No. 710, Canute S. S. Co., Ltd., v. Diamond Fuel Corporation, 273 Fed. 301, it was apparently found expedient to forbid the purchase of credits when the effect would be to relieve for export coal which would otherwise have gone to New England.

[1] The owner is right when it says that neither S. O. 6 nor any other government order then in force purported or intended to forbid the export of coal, and that it did not in fact do so. It points to the fact that while the order was in force it obtained a new coal charter, although at a much lower rate, for the very steamer the respondents refused. Its learned advocates insist that any difficulties or hindrances which the order in question put in the way of the charterer's getting coal to the ship were of too remote and indirect a character to constitute that restraint by public authority which the charterer had in mind. The order sought no more than to make New England, because of its urgent needs, a favored child. After it received what it was supposed was the daily share it required, or to which it was entitled, or which there were facilities for sending to it, the surplus might be shipped abroad.

Nor were the quantities so left available for the strangers' use mere crumbs from the children's table. They constituted by far the larger part of all that had been provided for the repast. S. O. 6 lasted but 39 days—from June 24th to August 1st, both inclusive. July was the only month during all of which it was in force. It is testified that, of all the coal which in that month was put over the Baltimore & Ohio pier, 70.7 per cent. went on foreign-bound ships. New England received 20.6, and the balance went to Chesapeake Bay and other coastwise destinations. Before the effect of the order was felt, 80 per cent. of the coal dumped over the pier went abroad. In other words, S. O. 6 cut down by one-eighth the proportion of coal which went out of the country. The figures for the Canton coal pier have not been so given as to be exactly comparable. The coal so handled constituted about one-third of that dealt with at Curtis Bay, and apparently even of this smaller quantity a still less considerable proportion went to New England.

It is true that because of S. O. 6, or for some other reason or reasons, the total tonnage of coal which came to the two piers in July was only about 75 per cent. of that which arrived in June, and about 80

per cent. of that which rolled in during August; but, even so, it compared very favorably with the figures of almost any preceding year. Export was never interrupted. There were 29 days from the 24th of June, when S. O. 6 went into force, until July 22, the day preceding the rechartering of the Iolcos. On each of 25 of them, at least one coal-carrying foreign-bound ship completed its loading at Baltimore. During the entire time, an aggregate of 57 of them were loaded, or almost precisely 2 a day, Sundays and holidays included. In the 70 days from April 15th to June 23d, 224 of them had been given cargoes, an average of 3⅕ a day.

The fact appears to be that, for the first few days after S. O. 6 had time to affect the operation of the piers, comparatively few foreign-bound colliers received cargoes, but that during the latter half of July they were loaded at the rate of almost 3 a day; that is, about as many of them were being supplied as before the order went into effect. The truth is that it was itself a consequence, and not the cause, of the difficulties in which so many coal shippers and would-be coal shippers found themselves in the spring and summer. of 1920. What brought about the trouble was that the charterer in these cases, as well as dozens of others operating through this and other ports, tempted by what appeared to be an easy opportunity to make a handsome profit by shipping coal to Europe, hired more vessels to carry it than it was possible for our railroads and piers promptly to load. The limits of their capacity, as well as the shortage in their equipment, and the labor difficulties by which they were embarrassed, were well known when this charter was made.

[2] It is true that, if the government had forbade the export of coal, the charterer would be excused, although, if such prohibition had not been issued, it would for other reasons have found it impossible to furnish a cargo; but, as has been pointed out, that the government never did. Doubtless, if without prohibiting others from sending coal abroad. the public authorities had commanded it not to do so, and had been able to make the order effective, it would have been equally freed of responsibility, but that, too, was not done unless the failure or refusal to grant a permit to put the coal on cars and send it forward to this ship was equivalent thereto. Was it?

The able and industrious advocates have cited all the cases in which have been discussed or applied the principles which have some relation to those which must be here considered, and all of those referred to, as well as others, have been carefully examined. A detailed analysis and discussion of them will be little to the point here, for no one of them had occasion to pass upon a state of facts closely resembling those at bar. The charterer stresses such cases as Hudson v. Ede, L. R. 2 Q. B. 566, 3 Q. B. 412, The Sailing Ship Allerton v. Falk, 6 Asp. Marine Cases, 287, Smith v. The Rosario Nitrate Co., Ltd., 1 Q. B. Div. 174, and Furness v. Forwood Bros. & Co., 77 Law Times, N. S., 85, in which, by the established custom of the trade and the port, goods of the kind to be transported were never stored at the water side, but, until the ship was ready for them, were kept somewhere else—a few or

many miles away, so that in a certain sense this more or less distant point was the storage place of the port, and for that purpose, perhaps, might be considered as within its bounds, and when the only commercially practicable way of getting the cargo to the ship was blocked by something which was, within some aptly expressed exceptions in the charter party, as by ice in the Danube, by neaps at the juncture of the Weaver and the Mersey, by civil war, or by floods and frost along the single railroad over which the cargo had to travel.

Reference is also made to Dobell v. Green, [1900] L. R. 1 Q. B. 526, where the charter was held subject to the terms of the guaranty of the particular colliery from which the charterer had notified the ship the coal was to come, as he had reserved the right to do. On the other hand, the owner affirms, with Lord Blackburn and numerous other judges, that as a rule the undertaking of the merchant to furnish a cargo is absolute. Postlewaite v. Freeland, L. R. 5 App. Cas. 620. There are limitations upon the doctrine. One of them, applied and enforced in the case last cited, might have been important in the case here tried. The ship, unless she protects herself by an appropriate stipulation, must, at her own charges, await access according to the custom of the port to its facilities for loading and discharging.

[3] The owners offered testimony to show that, if it had at Baltimore procured a cargo for the ship, it would not have been allowed by the railroad officials to take its place at the pier until a permit to move from the mines coal specifically for it had been granted by the agent of the Interstate Commerce Commission. The owner and the charterer, by inserting a provision in the charter party that "time for loading to count from 72 hours after master has given written notice of steamer's readiness to load to charterers or their agents, whether steamer is in berth or not," had, however, agreed that the charterer, and not the owner, should assume the risks of delays in getting a berth.

[4] As the language quoted is found in a typewritten interlineation in the printed form, which constitutes the body of the charter, it is evident that the minds of the parties were specially directed to the matter with which the amendment dealt, and it is familiar law that it must be given its natural meaning, even though such a construction may limit the terms of some of the printed clauses or even be inconsistent with them. Carver on Carriage of Goods by Sea, § 173; Clyde Commercial S. S. Co. v. West India S. S. Co., 169 Fed. 276, 94 C. C. A. 551. Of course it cannot be reasonably contended that the general declaration that performance shall be excused, if prevented by restraint of rulers, is made of no effect by this particular provision. But the owner insists that the insertion shows that the parties intended that the risks of any unusual delays, not clearly within the restraint of princes and other excepting clauses, should be assumed by the charterer, and that it emphasizes the general law that, while they will be given a common sense construction, they will not be extended beyond their plain import. The India, 49 Fed. 92; 1 C. C. A. 174.

[5] In order that the contingencies specified in them shall constitute a good defense, performance must have been thereby rendered in a

practical sense impossible, illegal, or dangerous. British & Foreign Marine Insurance Co. v. Sanday, [1916] L. R. 1 App. Cas. 650; Furness Withy & Co. v. Redereaktiegolabel Banco, [1917] Weekly Notes, K. B. 215. It is not sufficient that the happening of one of them adds materially to the difficulties and embarrassment of the parties relying on it, if nevertheless it is still possible to perform. Becker Gray & Co. v. London Assurance Corporation, L. R. 2 K. B. 156, [1918] L. R. App. Cas. 101.

[5] It is true that the restraint may not have been directed against the ship or the goods. It may have had other objects, as, for example, the prevention of ingress or egress to or from a besieged or blockaded place, and in that sense may have been indirect. Carver on Carriage of Goods by Sea, § 82; Rodocanochie v. Elliott, Law Rep. 9 Com. Pleas, 519. It must, however, have been the proximate, as distinguished from the remote, cause. W. K. Niver Coal Co. v. Cheronea S. S. Co., 142 Fed. 403, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126. If by itself it could not have prevented performance, it will not excuse merely because, in combination with nonexcepted clauses, it did so. Stevens v. Harris, 57 L. R. (N. S.) Q. B. 203; Adams v. Royal Mail Steam Packet Co., 5 C. B. (N. S.) 491.

[7] Still more clearly is it settled that it will not relieve from liability merely because its happening prevented the party relying upon it from getting his cargo for the ship from the source at which he had planned to obtain it, unless that was, by the terms of the charter, or in the contemplation of the parties at the time it was made, or by the well-established course of trade, the only source from which he could have been expected to get it. Grant v. Coverdale, L. R. 9 App. Cas. 470; Ardan S. S. Co. v. Weir, [1905] L. R. App. Cas. 501; Dinkam, Francis & Co. v. Witherington & Everett, [1916] Weekly Notes, K. B. 154.

The instant case is undoubtedly close, but to hold the charterer excused would extend the protection of the restraint of rulers farther than has ever before been done. In Vazalet v. Morris & Co., [1916] Court of Sessions Cases, 963, under a not dissimilar state of facts, the same question was raised, and although it was unnecessary there to pass upon it, Lord Mackenzie, who delivered the principal opinion, was evidently not impressed by a contention similar to that which the charterer here makes, and after much consideration, I find myself of like mind.

[8] It is no light matter to weaken the binding force of mercantile contracts, and the burden is heavily on him who asks that it be done. After the charterer, and others, who wished to ship coal abroad, had hired more ships than could be loaded with reasonable promptness, somebody was bound to lose heavily. W. K. Niver Coal Co. v. Cheronea S. S. Co., supra. Such miscalculations are always costly. They are less likely to be repeated, if those who make them find themselves unable to shift the burden to other shoulders.

As neither defense set up by the charterer can be sustained, it must be held liable for its failure to load the ship.