## CANUTE S. S. CO., Limited, v. DIAMOND FUEL CO., Inc.

### (District Court, D. Maryland.   May 4, 1921.)

### No. 710.

Shipping ☞52—Order giving priority to other shipments for first 30 per cent. of coal delivered does not excuse charterer.

A charterer is not excused for failure to furnish a cargo of coal as required by the charter party, by an order of the Interstate Commerce Commission giving priority to domestic shipments of coal in stated quantities, which left 70 per cent. of the coal arriving at the port of loading free for export.

In Admiralty.   Libel by the Canute Steamship Company, Limited, against the Diamond Fuel Company, Incorporated, to recover for the failure to furnish a cargo of coal as required by charter party.   Decree rendered for libelant.

The Severnmede was chartered on the Washington July, 1919, form, with conditions similar to those in the Renfrew, but without the clause: "This charter party effective, whether permit for cargo granted or not granted."

Charles R. Hickox (of Kirlin, Woolsey, Campbell, Hickox & Keating), of New York City, and Stuart S. Janney (of Janney, Stuart & Ober), of Baltimore, Md., for libelant.

R. E. Lee Marshall (of Brown, Marshall, Brune & Parker), of Baltimore, Md., and Clarence B. Smith (of Haight, Sandford, Smith & Griffin), of New York City, for respondent.

ROSE, District Judge.   In this case the libelant is the Canute Steamship Company, owner of the steamship Severnmede.   The respondent is the same Diamond Fuel Company which occupies a like position in No. 709, 273 Fed. 299.   Defense here is taken under the restraint of rulers clause.

The ship reported ready for loading on July 29th.   At that time the charterer failed to furnish a cargo, and notified the owner that it would not be able to do so, and on the 20th of August the owner withdrew the ship, with notice, however, that it would hold the charterer liable for all damages for failure to load.   When the ship arrived, Service Order No. 6 of the Interstate Commerce Commission, fully discussed in No. 724, Hellenic Transport S. S. Co. v. Archibald McNeil & Sons Co., Inc., 273 Fed. 290, was still in force, although the Commission, by Service Order No. 11, hereinafter referred to as S. O. 11, had some days previously directed that Service Order 6 should cease to be effective from and after August 2d.

From what S. O. 11 said and directed, as well as from other evidence in this series of cases it would seem that not only had there been a failure to realize the hope that the fuel needs of New England might be relieved by requiring permits before cars could be loaded to carry coal to tidewater for export, but that the permit system worked unsatisfactorily.   In determining to whom permits should be issued, the agents of the Commission had to take into account many different

sorts of factors, as, for example, the views of the State Department as to the relative urgency of the requirements of different European countries. It was impossible, therefore, to issue the sought for permits in any automatically operating order. Some who did not get them felt that they had been unjustly treated. In some instances, the would-be shipper who had failed to obtain permits found a way to get coal, due probably to the transfer of credits in the coal pools of the tidewater exchanges. The number of such cases was doubtless very few, but they were enough to furnish seed for rapidly growing rumors.

Apparently, therefore, the Commission made up its mind to discard altogether the necessarily somewhat arbitrary system of permits; but, as New England still needed from the mines of Pennsylvania, Maryland, and the Virginias not less than 1,250,000 tons of bituminous coal a month, and was getting not over 900,000, something had to be done. Accordingly the Commission tried to distribute mathematically the burden of meeting the requirements of that section of the country by S. O. 11, which directed that the needed coal should be furnished by New York, Philadelphia, Baltimore, and the Hampton Roads ports; 650,-000 tons being fixed as the quota of the last named, 250,000 of New York, a like amount of Baltimore, and 100,000 of Philadelphia. The amount to be supplied by each of these ports was further apportioned among the railroads serving it. Of the Baltimore allotment, the B. & O. was required to haul 160,000 tons a month, the Pennsylvania 50,000, and the Western Maryland 40,000.

A still further distribution was directed among the various coal-producing districts served by these railroads, and among each coal-producing station in such districts. No producer or shipper could get cars for other destinations until he had furnished his assigned daily proportion of coal required for New England; but, after he had done so, he was free from embargoes for the remainder of the day, and he might send his coal where he chose, and to whom. Coal shipped for New England could not be reconsigned to any but a New England port. Shippers having credits in a pool in an exchange of any of the transshipment ports, obtained as the result of shipments of coal under S. O. 11, were not to be permitted to draw against the credit and ship from such pool to any destination outside of New England.

Under the operation of this order, during the month of August, 70 per cent. of the coal shipped from Baltimore went abroad. It is quite clear that, whatever may be said as to S. O. 6, S. O. 11 did not constitute any such restraint of rulers as is contemplated by the exception in the charter party.

The respondent must therefore answer for its default.