## UNITED STATES v. CARGO OF LINSEED ON BOARD THE WEST TOTANT.

District Court, S. D. New York. April 26, 1927.

**Shipping ☞178—To relieve charterer from demurrage. liability on ground of unsettled labor conditions, due diligence to expedite loading must be shown.**

To relieve a charterer from liability for demurrage on account of extended delay in loading, on the ground that at the port of loading there was a congestion of freight, delay in moving cars, and loading conditions generally were in confused condition as the result of a recent labor strike, it must be further shown specifically what effect such conditions had on the loading of the particular ship, and that charterer used due diligence to expedite the loading.

In Admiralty. Suit by the United States against a cargo of linseed on board the steamship West Totant. Decree for the United States.

Emory R. Buckner, U. S. Atty., of New York City (Walter Schaffner, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Graham, McMahon, Buell & Knox, of New York City (Edward Ward McMahon and Lloyd E. Lowe, both of New York City, of counsel), for respondent.

KNOX, District Judge. The United States, as owner of the steamer West Totant, acting through its agent, the Munson Line, made a charter party with Bolle-Watson, Inc., to carry a full cargo of wheat, corn, and/or linseed, at charterer's option, from "Buenos Aires, Argentine (charterer's option of loading vessel to a safe draft at Rosario and completing at Buenos Aires), to New York direct." The document, among other things, provided:

"That the lay days for loading and discharging shall be as follows: Commencing from the time that the captain reports his vessel ready to receive or discharge cargo, whether in berth or not, at the rate of not less than 800 tons per running day, excluding Sundays and holidays, for loading. * * *

"And for each and every day's detention by the fault of the said party of the second part [the charterer] or agent, forty-eight cents United States currency per gross registered ton per day, day by day, shall be paid by said party of the second part or agent to said party of the first part. * * * "

The charter also carried an addendum which the charterer claims exempts it from liability for the demurrage here sought to be collected. It is in these terms:

"If the cargo cannot be loaded by reason of riots, civil commotions, or of a strike or lockout of any class of workmen essential to the loading of the cargo, or by reason of obstructions or stoppages beyond the control of the charterers on the railway, or in the docks or other loading places, * * * the time for loading * * * shall not count during the continuance of such causes: Provided that a strike or lockout * * * shall not prevent demurrage accruing if by use of reasonable diligence they (the shippers) could have obtained other suitable labor at rates current before the strike or lockout. In case of any delay by reason of the before-mentioned cause, no claim for damages or demurrage shall be made by the charterers, receivers of the cargo, or owners of the steamer. * * * "

The West Totant reached Rosario Roads on March 27, 1920. Two days later, at 9 o'clock a. m., her captain notified the charterer's agents of the vessel's readiness to load. She was accepted by the agents, and immediately assigned a berth. On March 30th,

at 3 o'clock p. m., the actual loading of linseed, in bags, began. The process continued daily, excepting holidays and Sundays, until April 28, 1920, when at 9:15 p. m., she had a full cargo, amounting to 7,346 tons.

Had loading gone forward at the rate of 800 tons per day, as called for by the charter party, the operation should have been complete in 9 days, 4 hours and 38 minutes, which, with allowance for free time, would have been April 12, 1920, at noon. The excess time, therefore, as claimed by the owners, is 17 days and 3 hours. Its value as fixed by the charter, amounts to $51,529.82.

Claimant contends that the delay in loading cargo comes within the exceptions of the addendum carried by the charter party, in that from February 19, 1920, to April 15, 1920, a state of force majeure obtained at Rosario, and that, in consequence, the loading occupied but 1 day, 10 hours and 50 minutes more than the time allowed by the charter.

There is no doubt that there was a serious labor disturbance in Rosario during the months of February and March, 1920. But, as nearly as can be made out from the evidence, the striking laborers resumed work on or about March 29, 1920. There was, however, a serious congestion of ships in the harbor, and a like condition of loaded railway cars in the yards at or near the loading docks. Faced with these conditions, the opposing interests of shippers and carriers, as fixed by outstanding contracts, manifested themselves in a series of so-called "official" declarations as to the actual status of conditions.

Upon March 31, 1920, the masters of some 17 cargo vessels, then lying at Rosario, addressed a communication to the president of the Chamber of Commerce to the effect that, although the strike had ended on March 27, 1920, the Chamber had not announced the fact. The failure so to do was regarded by the masters as prejudicial to their owners, inasmuch as, until such declaration was made, the shippers would not recognize the accrual of demurrage on chartered vessels. On the same day, the Rosario Maritime Association requested the Chamber of Commerce to declare that the former abnormal conditions, due to the strike, were ended, and work normalized. On April 5, 1920, the latter communication was answered by a letter, which inclosed a resolution of the Chamber that day adopted by one of its committee, which read as follows:

"In view of the situation created by the strike of stevedores and laborers, the committee declares that the state of strike has ceased, and that no interference in the loading and unloading of railroad cars exists; but in consequence of the recent stoppage of work there is a congestion of ships in the port of Rosario, many of which cannot dock for lack of room at the docks, and it being a fact which interferes with the cargo being loaded or unloaded, for causes outside the control of the charterers, the Chamber also declares the existence of a state of force majeure in the port of Rosario for the loading and unloading of ships, to and including the 15th day of the current month."

In order to excuse itself for delay in loading the West Totant, claimant places much reliance on this document. Libelant questions, not only the admission of the resolution as competent evidence of what it purports to declare, but the effect and accuracy of its contents as well.

So far as actual conditions were concerned, it is reasonable to infer that, for some time after the ending of the strike, the demand for stevedores and laborers was probably greater than the supply, and further that the ships awaiting cargoes of seed and cereals created a demand for those products that was in excess of the quantities then in storage, either in warehouses or in cars stored in the yards. That this demand must have been large and insistent is indicated by the fact that in April, 1920, the railway handled 7,541 freight cars in Rosario, against 4,130 in the same month of 1919, where there was no aftermath of a strike in existence. Over the same first half of April, 55 loaded vessels left the port, against a normal number of 30.

The voluminous depositions of shippers, stevedores, and brokers, taken at Rosario, have been read with care; but in my opinion a substantial summary of their contents is to be found in the report of the supercargo of the West Totant. It is as follows:

"The slow loading at Rosario was due to conditions resulting from a strike of stevedores that ended just before arrival of the West Totant at the port for loading. The daily delay in loading was due, not to a shortage of stevedores, who had returned to work, but to the congestion of freight in the port after the tie-up of the strike, which made it impossible to supply the ship with loaded cars fast enough to freight the ship with dispatch."

The effect of this statement should be considered in connection with evidence introduced before me in open court. It consists of a tabulation of the linseed that claimant

avers to have gone on board the West Totant, and was produced during the testimony of the employee of Bolle-Watson who had general supervision of all transactions of this character, but who *was not* in South America. That record purports to show that, of the linseed loaded on board the steamer, at least 5,869 tons did not come from cars, but from storage at Rosario. There is no disclosure as to whether the charterer was the owner, or consignee, of linseed in cars tied up in the yards, which could not be moved to the dock, or whether its cargo, which came from cars, was brought down from the up country, or some other point, after traffic began to move. That the latter may have been the fact is indicated by the contracts under which the seed was purchased. It appears that 500 tons was purchased on January 29, 1920, for delivery in February, March, and April. Nothing is shown as to when the deliveries were made. On March 4, 1920, 100 tons were purchased for delivery up to March 15, at Darsena, which is, I understand, far enough away from Rosario to require about five hours to make the trip under ordinary conditions. Another lot of seed, amounting to 712 tons, was purchased on February 26 and 28, for immediate delivery at Darsena, and it was at this latter point the further quantity of 272 tons was to be delivered.

In all, there were about 1,083 tons of linseed at Darsena, and about 6,363 in storage at Rosario. Yet, according to the testimony of the master of the vessel, the supply of seed in storage at Rosario was not drawn upon for more than two to four days and thereafter the ship was loaded from railway cars. If this be true, and there is no evidence other than the record of claimant, prepared in New York by a man who was not in the Argentine, to contradict it, not more than 1,500 tons of linseed were taken from a supply that was in no way dependent upon congestion of cars at the port.

Before relieving claimant of demurrage, the court should have some competent proof as to why the procedure followed in loading was adopted, and upon this point there is no explanation whatever from claimant's agents or stevedores in Rosario. Reliance is placed upon the force majeure certificates issued by a private trade body, and upon testimony given by persons who are without all knowledge as to claimant's spot supply of grain, and the requirements of vessels it may have had under charter from Rosario and Darsena. If, aside from the question of conges-tion of the port and railway, resulting from the strike, the charterer had seed which might have been placed on the West Totant, it could not refrain from using the same while awaiting the arrival of further supplies from other points; and, if it be that the supply at Rosario was not sufficient to load the ship, the charterer; if it is not to pay the demurrage claimed, should show how and to what extent it was prevented from getting seed to complete the cargo at Rosario. This it has wholly failed to do. The existence of congestion on the railway, if it did not directly prevent the charterer from fulfillng its obligation, will not excuse its default. The court is more interested in how the conditions of the port affected the loading of charterer's seed than in the general condition that prevailed. The restraint, under which charterer labored, must have been the proximate, as distinguished from the remote, cause of the delay. W. K. Niver Coal Co. v. Cheronea S. S. Co. (C. C. A.) 142 F. 403, 5 L. R. A. (N. S.) 126, quoted with approval in Hellenic Transport S. S. Co. v. McNeil & Sons Co. (D. C.) 273 F. 296.

Among items of proof that are important, and as to which convincing evidence is lacking, are the following: The location of the cargo that went into the vessel; efforts made to procure more stevedoring gangs, in the competition for them that probably prevailed; efforts made to procure placement of cars at or near the dock at which the vessel lay; reasons for failure to load wheat or corn, if linseed were unobtainable; and, if linseed were not taken from warehouses in greater quantities than is inferable from the testimony of the captain, the reason for a failure so to do. Surely a charterer, without a showing of due diligence to fulfill its obligations, may not, at the expense of a vessel, supinely and safely rest on a declaration of force majeure issued by a private organization, that is, in view of the present record, open to the suspicion that it is not wholly unprejudiced in favor of the welfare of Argentine shippers.

The self-serving character of the document is revealed by its definite fixation of a date at which the condition of force majeure was to come to an end. The ending of a state of affairs occasioned by labor disturbances is not usually so capable of exact determination. Then, too, as previously suggested, generalities as to what may be said to have been the fact with respect to conditions prevailing in the port as a whole will not excuse a shipper that might have been able to overcome the difficulties confronting

it, had prompt and efficient steps in that behalf been taken.

The libelant is entitled to a decree.