SAMUEL H. COTTRELL & SON v. SMOKELESS FUEL CO.

(Circuit Court of Appeals, Fourth Circuit. November 8, 1906.)

No. 611.

SALES—CONTRACT FOR SALE AND DELIVERY OF COAL—EXCUSE FOR FAILURE TO MAKE DELIVERIES.

Under a provision of a contract for the sale and delivery of coal from a certain mine at stated prices, that deliveries should be subject to strikes "which might delay or prevent shipment," the seller was not excused from performance because of a strike at the mine which did not prevent or delay shipments of coal, but merely increased the cost of production and the cost to the seller, and its refusal to make deliveries for that reason was a breach of the contract.

In Error to the Circuit Court of the United States for the Eastern District of Virginia, at Richmond.

For opinion below, see 129 Fed. 174.

H. R. Pollard, for plaintiffs in error.

Conway R. Sands and Alexander H. Sands, for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and BOYD, District Judge.

BOYD, District Judge. The plaintiffs are residents and citizens of the city of Richmond, in the Eastern district of the state of Virginia, and the defendant, the Smokeless Fuel Company, a West Virginia corporation doing business in the said city of Richmond. On the 17th of April, 1902, a written contract was entered into between the plaintiffs, Samuel H. Cottrell & Son, and the defendant, the Smokeless Fuel Company, as follows:

"This agreement, entered into this 17th day of April, 1902, by and between the Smokeless Fuel Company, party of the first part, and S. H. Cottrell & Son, party of the second part, both of the city of Richmond, witnesseth: That the said party of the first part agrees and binds itself to furnish and deliver, to the party of the second part, on board cars at Richmond, all the New River R. O. M. steam coal from Collins Colliery Company they may need from April 17, 1902, to April 17, 1903, approximating 3,000 tons more or less, and to ship the same in such quantities and at such times as the said party of the second part may from time to time direct, during the continuance of this contract, and at the following prices: All coal going to Elba Station, $2.57 f. o. b. C. & O. tracks: all deliveries to other parts of Richmond, where no switching charge is made on coal, at $2.60 per net ton of 2,000 lbs. delivered. Said party of the first part further agrees that should the general market value of coal decline during the lifetime of this contract, based on the wage scale at the mines or reduction in freight rates, that the said party of the second part is to have advantage of whatever reduction is made on all coal shipped after the said reduced rates are put into effect.

"In consideration of the above, the party of the second part agrees to buy from the party of the first part all the New River R. O. M. steam coal it may need, as hereinbefore specified, and to pay therefor to the party of the first part at the prices set forth above on or before the 20th of each calendar month for all shipments made during the previous month. All settlements to be made on railway scale weights as ascertained at the usual points of weighing for these mines, and as shown on bills to be rendered by party of the first part in accordance with the usages of the coal trade. Party of the second part is to pay all freights and deduct same from the bills rendered by the seller. Deliveries of coal under this contract are subject to strikes, accident, interruptions to transportation and other causes beyond the control of the party of the first part which may delay or prevent shipment.

"In witness whereof the said parties hereto set their hands this 17th day of April, 1902.

"[Seal of Smokeless
Fuel Company.]

Smokeless Fuel Company,
C. J. Milton, Pres.
"S. H. Cottrell & Son.
"Sam'l H. Cottrell & Son."

The defendant company, between the date of the contract and June 10th of the same year, delivered to the plaintiffs about 563 tons of coal, but after that date failed and refused to make further deliveries of coal to the plaintiffs under the contract. Thereupon, in May, 1903, the plaintiffs brought suit against the defendant in the circuit court of Richmond, Virginia, and filed a declaration complaining of the defendant of a plea of trespass on the case in assumpsit, founded upon a breach of the contract and alleged damages by reason thereof in the sum of $5,000. Upon the petition of the defendant company the case was removed to the Circuit Court of the United States for the Eastern District of Virginia. A demurrer was filed by the defendant to the

declaration of plaintiffs, which was overruled, and thereupon the defendant filed its plea of general denial and non assumpsit. A jury trial was had upon the issues thus raised by the pleadings, and at the close of the testimony the court instructed the jury to return a verdict for the defendant, which was done, to which instruction the plaintiffs duly excepted. The case is brought here by writ of error sued out by the plaintiffs to have this action of the Circuit Court reviewed.

It is shown in the evidence that, after the defendant company had partially complied with the contract, as above stated, a strike was inaugurated at the mines of the Collins Colliery Company, from which, under the contract, the coal was to be furnished; that the strike necessitated the employment of guards and otherwise increased the expenses of mining and shipping coal from the said mines. The mines, however, did not cease to operate, and coal was continued to be shipped therefrom to the defendant at Richmond, and the defendant continued to furnish other parties with the same character of coal described in the contract, but at a higher rate than that named in the contract. The defendant also proposed to the plaintiffs to furnish them any quantity of the coal such as described in the contract, but at a higher price than that named therein. The Circuit Court held that the existence of a strike at the Collins mine had the effect to abrogate the contract from the day that the strike commenced and to relieve the defendant from further obligation thereunder. The paragraph of the contract upon which the Circuit Court based its ruling is the last clause, and reads as follows:

"Deliveries of coal under this contract are subject to strikes, accident, interruptions of transportation and other causes beyond the control of the party of the first part which might delay or prevent shipment."

Let us analyze this paragraph, and, taking it in connection with the preceding agreements, determine, if possible, its meaning. The defendant agreed to deliver to the plaintiffs, within a specified period, the quantity of coal named at a certain price per ton, and the defendant was bound to carry out this contract, unless the conditions or some one of them provided for in the paragraph quoted arose and were such as to prevent performance. The sole ground upon which the defense is based is that a strike took place at the mine; for there is no allegation that accidents, interruptions of transportation, or other causes interfered, nor does it appear that the strike delayed or prevented the shipment of coal. On the other hand, the undisputed testimony is that the strike was kept under control. The mines continued in operation, and shipments of coal of the character contracted for were continued to the city of Richmond, Va. Shipments of this coal were made to the defendant, and the defendant was offering it on the market at an advanced price, even proposing to sell it to the plaintiffs in such quantities as they might require. Therefore the paragraph of the contract, eliminating that part not necessary to consider here, would read as follows:

"Deliveries of coal under this contract are subject to strikes * * * beyond the control of the party of the first part which might delay or prevent shipment."

What is meant by the phrase "beyond the control of the party of the first part?" The contract was for the delivery of coal from a certain mine, and evidently the strikes contemplated at the time of making the contract were strikes at that mine. So far as appears, the defendant had nothing to do with the actual operation of the mine. It was simply dealing in the product. Necessarily, therefore, the conclusion to be drawn is that a strike, in order to affect the contract, must be such as to be beyond the control of the operators of the mine and thus delay or prevent shipments. It does appear from the record that the strike at the mine necessitated the employment of guards and other means, which increased the cost of production, and the decision of the Circuit Court seems to be based upon the view that this condition authorized the defendant to annul its contract. In this, we think there was error. It was a question of fact which might properly have been submitted to the jury, as to how far the defendant's ability to perform the contract was affected by the conditions existing at the mine on account of the strike, and the extent to which plaintiffs were entitled to recover for defendant's failure would depend upon how this fact was determined. But, under the circumstances of this case, the mere fact that a strike was inaugurated did not, in our opinion, warrant the defendant in refusing the further performance of the contract.

"It is a well-settled rule of law that, if the party, by his contract, charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforseen difficulties, however great, will not excuse him." Dermott v. Jones, 69 U. S. 1, 17 L. Ed. 762. "The law regards the sanctity of contracts and requires the parties to do what they have agreed to do. If unexpected impediments lie in the way, and a loss must ensue, it leaves the loss where the contract places it. If the parties made no provision for a dispensation, the rule of law gives none. It does not allow a contract fairly made to be annulled, and it does not permit it to be interpolated by the parties themselves who made it." Id. "The courts will not make an agreement for the parties, but will ascertain what they have agreed by what they have said and by the meaning of the words used to express their intention. Where the intention clearly appears from the words used, there is no need to go further, for in such cases the words must govern; or, as is sometimes said, where there is no doubt, there is no room for construction." Clark on Contracts, p. 591. "Where parties have entered into written engagements, with express stipulations, it is manifestly not desirable to extend them by implication. The presumption is that, having expressed the same, they have expressed all the intentions by which the intent could be bound under that instrument." Broom's Legal Maxims (8th Am. Ed.) p. 652; Bishop on Contracts (1887 Ed.) §§ 380, 381; Parsons on Contracts (9th Ed.) p. 915.

By the contract in question, the defendant was bound to sell and deliver to the plaintiff all the coal that should be required by the latter, between the dates mentioned; the quantity named being 3,000 tons, more or less, and at the prices per ton named in the contract. Nothing

else appearing, this was an absolute promise on the part of the defendant, based upon a sufficient consideration to furnish the coal, and nothing would excuse the performace of this promise except the act of God, the law, or the conduct of the plaintiff. There was, however, one, and only one, limitation upon this otherwise absolute undertaking, and that limitation is found in the clause of the contract which exempted the defendant from liability for nonperformance, if by strikes or other uncontrollable causes it should become unable to comply with its contract; that is, if strikes or any of the other causes mentioned occurred in such manner as to be beyond the control of the defendant or the operators of the mine from which the coal was to be brought, so as to delay or prevent shipment. The defendant was relieved from the obligation to the extent that such conditions rendered it unable to perform the contract fully, and to this extent only.

We see no merit in the position of counsel for the defendant in error that the testimony in the case is not sufficiently identified. The trial judge, in allowing the two bills of exceptions, directs in each that the evidence offered by the plaintiffs and by the defendant, "all of which as reported and filed by the official stenographer in this case, is to be incorporated and copied by the clerk herein and made a part of this bill of exceptions." Immediately following the exceptions is the testimony in full certified by the stenographer who took it on the trial, and whose report was, as appears, accepted by the court and the counsel. There is no suggestion that the testimony set out in the record, as a part of the bills of exceptions, is not that given by the witnesses and shown by the exhibits on the trial. The trial judge adopted the testimony as taken and certified by the stenographer and incorporated it in the bills of exceptions. This, in our opinion, is sufficient.

The judgment of the Circuit Court is reversed, and the case remanded, to the end that further proceedings may be in harmony with the views herein expressed.

Reversed.