**KRUG, Secretary of the Interior, et al. v. FOX.**

**No. 5594.**

Circuit Court of Appeals, Fourth Circuit.

May 22, 1947.

J. Francis Hayden, Sp. Asst. to Atty. Gen. (John F. Sonnett, Asst. Atty. Gen.,

Wayne T. Brooks, U. S. Atty., and Howard Caplan, Asst. U. S. Atty., both of Clarksburg, W. Va., and John Ford Baecher, Sp. Asst. to Att. Gen., on the brief), for appellants.

Kermit R. Mason, of Morgantown, W. Va., for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal from an order granting an interlocutory injunction in a suit against the Secretary of the Interior of the United State, the Coal Mines Administrator, the Administrator's Comptroller and the Resident Officer in Charge of Fox Coal Company Mine Number 3 in the Northern District of West Virginia. The complaint alleged that plaintiff was the owner of that coal mine, that the defendants were operating it in defiance of the property rights of plaintiff and in an improper manner and that plaintiff was in grave danger of suffering irreparable damage. The prayer of the complaint was that defendants be restrained from interfering in the operation of the mine by plaintiff, that they be required to return same to his possession, and that the court determine sundry question connected with its seizure and operation. The order granting the interlocutory injunction restrained defendants from further interfering with the property of plaintiff and directed that they immediately return to him the mine that they had seized. Appeal was promptly taken from the order and its operation was suspended by this Court pending the appeal.

The facts are that, because of the general bituminous coal strike beginning April 1, 1946, the President of the United States issued Executive Order No. 9728 on May 21, 1946, authorizing the Secretary of the Interior to take possession of and operate any or all of the bituminous coal mines of the country. This order was issued by the President as Commander-in-Chief of the Army and Navy under the authority of Section 9 of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 309, as amended by the War Labor Disputes Act, 50 U.S.C.A.Appendix, § 1503.

The Secretary of the Interior issued orders on May 21 and 27, 1946, taking possession of most of the bituminous coal mines, but inadvertently omitting a few including the mine of plaintiff. On August 2, 1946, however, he issued another order, to become effective August 5, 1946, taking possession of 71 additional bituminous mines, including the mine of plaintiff, and reciting that the causes for the existing or threatened labor disturbances which prevailed at the time of the Executive Order still prevailed at these mines.

The order of August 2nd provided that the regulations of the Coal Mines Administrator should apply to the mines seized under the order and designated the president or chief executive officers of the mining companies operating them as operating managers for the United States, with provision that each officer so designated should be deemed to have accepted the designation unless he gave notice to the contrary within ten days. Plaintiff was thus designated operating manager of his mine and did not protest within the ten day period. Thereafter difficulties arose, and plaintiff asked to be relieved of his duties as operating manager, but continued to act in this capacity for a number of months. After the seizure of mines under the Executive Order, an agreement, known as the Krug-Lewis Agreement, was entered into between the Secretary of the Interior and the United Mine Workers of America, regulating wages and terms and conditions of employment on a nationwide basis in the mines which had been seized; and, following the seizure of the 71 mines on August 5th, this agreement was made applicable to them and orders were issued by the Coal Mines Administrator to that effect. Plaintiff as operating manager for the United States of his mine failed to comply with these orders in that he failed and refused to make payments to the welfare and retirement fund which had been established, to check off union dues from wages and to reinstate an employee found by an umpire to have been wrongfully discharged. Because of this refusal to obey orders, he was discharged as operating manager of the mine as of midnight on January 5, 1947, and a naval officer was designated by the

Coal Mines Administrator to take over in his stead and has since been in charge.

The plaintiff filed suit in the court below on January 11, 1947. Motions to dismiss and to quash were filed by defendants on the ground that the court lacked jurisdiction of the subject matter, as the action was in effect one against the United States, and that the defendants, other than the resident officer in charge of the mine, were not citizens of West Virginia and were not served with process in that state. The court withheld a ruling on the motions until after hearing evidence on the merits and then held that the suit was not one against the United States and that the venue and service of process were proper. He found that the plaintiff's mine was not seized by defendants until January 1947, that the seizure was unwarranted, that the mine was being improperly operated by defendants and that, if they were allowed to continue in possession and operation thereof, plaintiff would suffer irreparable damage. He signed an order granting the interlocutory injunction prayed and directing defendants to return the property to plaintiff.

The crucial question presented for our decision is whether the possession and operation of the mine by officers of the government is lawful. If it is not lawful, the court unquestionably has jurisdiction of the cause to enjoin encroachment on plaintiff's property rights by those within the territory of its jurisdiction who are acting outside the law. Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570; State of Colorado v. Toll 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927. If it is lawful, however, the Court is without jurisdiction of the cause for reasons which we shall point out hereafter. We think it clear that the possession and operation were lawful.

In war time, the President of the United States, as Commander in Chief of the Army and Navy, has under our Constitution, and must have, vast powers for the carrying on of the war effort, not only over the military establishment of the country but also over its civilian economy. In addition to the power over the operation of the coal mines, so obviously necessary to the proper prosecution of the war effort, which might be thought to arise out of constitutional provisions without legislation, he was expressly authorized by statute to seize and operate "any plant, mine, or facility equipped for the manufacture, production, or mining of any articles or materials which may be required for the war effort or which may be useful in connection therewith", and to exercise such power through any department or agency of the government that he might designate, "whenever the President finds, after investigation, and proclaims that there is an interruption of the operation of such plant, mine, or facility as a result of a strike or other labor disturbance, that the war effort will be unduly impeded or delayed by such interruption, and that the exercise of such power and authority is necessary to insure the operation of such plant, mine, or facility in the interest of the war effort." Sec. 9 of Selective Training and Service Act of 1940, 54 Stat. 892, as amended by the War Labor Disputes Act, 57 Stat. 164, 50 U.S.C.A.Appendix, §§ 309, 1503. No question is made, and none could reasonably be made, as to the constitutionality of this statute; and there can be no question, of course, as to bituminous coal being required for the war effort, or being "useful in connection therewith". As to the finding and proclamation by the President, that is contained in Executive Order No. 9728, and is as follows:

"* * * after investigation I find and proclaim that there are interruptions or threatened interruptions in the operation of the mines producing bituminous coal as a result of existing or threatened strikes and other labor disturbances; that the coal produced by such mines is required for the war effort and is indispensable for the continued operation of the national economy during the transition from war to peace; that the war effort will be unduly impeded or delayed by such interruptions; and that the exercise, as hereinafter specified, of the powers vested in me is necessary to insure the operation of such mines in the interest of the war effort and to preserve the national economic structure in the present emergency."

The Secretary of the Interior was authorized by this order of the President to take possession of and operate all the bit-

uminous coal mines of the country; and, as heretofore stated, he did seize and take possession of the mine of plaintiff on August 5th. There can be no question, we think, as to the validity of such seizure or as to the validity of the subsequent exercise of power in the operation of the mine by officers of the government. United States v. United Mine Workers of America, 67 S.Ct. 677. Since the power exercised by the President through the Secretary of the Interior was clearly authorized by statute, which did not offend constitutional provisions, it is not necessary to decide whether, in the absence of such statutory authorization, the power would have existed under the Constitution alone. See United States v. Montgomery Ward & Co. 7 Cir. 150 F.2d 369, 380 et seq.; Ken-Rad Tube & Lamp Co. v. Badeau, D.C., 55 F.Supp. 193, 197.

The learned judge below was of opinion that there was no seizure of the property until January 1947, when plaintiff was ousted as manager, and when the mine could not be lawfully seized because of the termination of hostilities as of December 31, 1946, by the proclamation of the President, No. 2714, 50 U.S.C.A. Appendix, § 601 note.[1]

The Judge was of opinion that what had been done in August amounted to a mere paper seizure, which conferred no rights upon the government; but in this we think he was clearly wrong. No authority is cited for the holding and we know of none. In seizing the coal mines of the country, it was necessary that the President and the Secretary act quickly; and there would have been little possibility of the successful exercise of the power granted by Congress, if it had been required of government officials that they send out men from Washington to take physical possession before the seizures under the act would be valid. Those who were in control of the mines were willing to operate them as agents of the government; and no reason suggests itself why a valid seizure under

the statute did not result from the method followed of notifying those in charge that they should proceed as agents of the government, and would be presumed to accept appointment as such, in the absence of notice to the contrary.[2] The government retained ultimate control of the mines, even though the private managers were kept on with substantially the same functions and authority as previously, as the regulations for operating provided for the removal of the operating managers at the discretion of the Coal Mines Administrator. As said by the Supreme Court in United States v. United Mine Workers of America, 67 S.Ct. 677, 693:

"It is true that the regulations for the operations of the mines issued by the Coal Mines Administrator provide for the retention of the private managers to assist in the realization of the objects of government seizure and operation. The regulations, however, also provide for the removal of such operating managers at the discretion of the Coal Mines Administrator. Thus the Government, though utilizing the services of the private managers, has nevertheless retained ultimate control."

Justices Black and Douglas dealt with the matter as follows (page 713 of 67 S. Ct.):

"We have no doubt that the miners became Government employees when the Government took over the mines. It assumed complete control over the mines and their operation. The fact that it utilized the managerial forces of the private owners does not detract from the Government's complete authority. For whatever control Government agents delegated to the private managers, those agents had full power to take away and exercise themselves."

It is argued for plaintiff that, more than 60 days prior to the institution of suit, production in the bituminous mines throughout the country and particularly in plaintiff's mine, had reached a level as

[1] The statute provided that possession of mines and plants might not be taken after the termination of hostilities as proclaimed by the President. See 50 U.S.C. A.Appendix, §§ 309 and 1503.

[2] In the case of plaintiff, he not only did not object to the appointment as agent but proceeded to act under it and later attempted to resign.

high as or higher than that prevailing at the time of seizure, and that the right to hold possession was therefore at an end both under the terms of Executive Order 9728 and the proviso of the War Labor Disputes Act, which provide that possession shall be terminated not later than 60 days after the restoration of the productive efficiency of any such mine or mines prevailing prior to the taking of possession thereof. It is clear, however, that whether such productive efficiency has been restored or not, is a question addressed to the discretion of the executive and involves a great deal more than mere level or volume of production. It involves, among other things, the stability of labor relationships; and it is a matter of general and common knowledge that labor relationships in the bituminous mines had not then reached, and have not yet reached, such condition of stability that the mines could be released by the government without grave danger of a recurrence of labor disputes that would completely disrupt production. The problem was considered at length by Attorney General Biddle, in connection with an earlier seizure of the mines, where he held that "productive efficiency" as used in the War Labor Disputes Act cannot be measured by volume alone, but that consideration must also be had as to whether relinquishment of government possession will not lead to the very conditions that prompted seizure. In this connection he said (40 Opinions Attorney General No. 77):

"It seems obvious that even though the previous level of production may be fully restored under government possession, it is inconsistent with the purposes of the act to return the mines to their private owners if, in the light of all factors involved, you have concluded that the return will result in a recurrence of strikes or stoppages which will require the government again to take possession under the act. The return of possession to the owners of the mines under such circumstances would frustrate the purposes of the original seizure. To hold that return of possession is required in the face of a threatened recurrence of strikes or work stoppages would compel the government to go through the idle ceremony of relinquishing possession under one Executive Order and retaking possession under another. This would render the criminal provisions of the act inapplicable at the very time when they may be needed to promote the purposes of the Congress in enacting the War Labor Disputes Act. * * * The productive efficiency of a mine cannot be determined alone by the physical volume of coal produced at a given time; it is also necessary to consider whether, if the government relinquishes possession, there will be further interferences with production through strikes or stoppages or threats of strikes or stoppages."

■ Since the Executive has not made any finding that would necessitate the relinquishment of the mines and since there is neither allegation nor proof of any facts which would justify a finding of any abuse of executive discretion with regard thereto, we cannot find in the production relied on any basis for the contention that the possesion by the government of plaintiff's mine, which became effective on August 5, 1946, has legally ended.

■ For the reasons stated, we think it clear that plaintiff's mine was lawfully seized by officers of the United States on August 5, 1946, under the provisions of the War Labor Disputes Act and the Executive Order issued pursuant thereto, and that defendants, in exercising possession over the mine property and operating it, are acting in their official capacities as officers of the government. This suit, therefore, is not one to enjoin individual action not warranted by law, but a suit to restrain officers of the government from acts undertaken in performance of their duty and, in so far as it asks a return of the property, to compel action through judicial mandate in a matter with respect to which discretion has been vested in the executive. Whatever the parties may call it, this is a suit against the United States; and the suit must fail because the United States, being a necessary party, has not been made a party and cannot be made a party since it has not consented to be sued in a suit of this character. The precise question was before this Court in Ferris v. Wilbur, 4

Cir., 27 F.2d 262, 263, where we stated the applicable rule with supporting authority as follows:

"It is manifestly, then, not a suit to restrain unauthorized action by a government official, or action based upon an unconstitutional statute, but a suit to restrain action in which the official is exercising valid governmental authority by virtue of his office. There can be no doubt that such a suit is in essence a suit against the United States, and that the United States is a necessary party thereto. And, as it has not consented to be made a party, the suit must fail. Morrison v. Work, 266 U.S. 481, 488, 45 S. Ct. 149, 69 L.Ed. 394; United States ex rel. Goldberg v. Daniels, 231 U.S. 218, 221 to 222, 34 S.Ct. 84, 58 L.Ed. 191; Naganab v. Hitchcock, 202 U.S. 473, 476, 26 S.Ct. 667, 50 L.Ed. 1113; International Postal Supply Co., v. Bruce, 194 U.S. 601, 606, 24 S.Ct. 820, 48 L.Ed. 1134; Belknap v. Schild, 161 U.S. 10, 16 S.Ct. 443, 40 L.Ed. 599."

We pointed out in that case the distinction between such a case as we have here and a case of the class upon which plaintiff relies, saying of the latter:

"In such case the officer in possession is sued, not as or because he is the officer of the government, but as an individual. The court is not ousted of jurisdiction merely because he asserts authority as an officer, but the burden rests upon him to show that his authority is sufficient in law to protect him. There is an obvious distinction between such a case and one where defendant is sued as an officer of the government, and it is sought to restrain him from action taken in the exercise of a discretion reposed by Congress in the Executive Department. Where the act complained of is not authorized by statute, or where the statute authorizing it is void because in conflict with some provision of the Constitution, the person attempting it may be restrained in a proper case, notwithstanding his claim that he is acting in his official capacity. In such case he is acting, not within the law, but outside it, his act is not the act of the government, and the law affords him no protection for what he is doing or is about to do. This is true, whether he be the head of a department or merely a subordinate

acting under orders; and, if a subordinate, there is no necessity of joining as defendant the head of the department because the orders of the head are immaterial if the act sought to be enjoined is not authorized by law. [State of] Colorado v. Toll, supra. These doctrines, however, have no application where, as here, the official is acting under the authority of a statute which does not offend any constitutional provision. In such case his action is the action of the government; if injunction is awarded against him, it is the action of the government, and not his individual action, which is restrained; and the government is consequently a necessary party to the suit, which must fail unless it has consented to be sued."

Directly in point also is the decision of this Court in the recent case of Ainsworth v. Barn Ballroom Co., 4 Cir., 157 F. 2d 97, 101, where Chief Justice Groner of the U. S. Court of Appeals for the District of Columbia, sitting by designation as a member of this Court, stated the applicable rule tersely and succinctly as follows:

"Stated in its simplest terms, the rule by which courts are controlled in situations analogous to those obtaining here is that where the defendant-official is engaged in something which the law authorizes him to do, or, is acting pursuant to valid authority validly conferred, the suit will be held to be against the United States. But where the authority to do the particular act had not been conferred, or constitutional power to confer it is lacking, the suit is not subject to the objection that it is against the United States."

See also Wood v. Phillips, 4 Cir., 50 F. 2d 714, and Appalachian Electric Power Co. v. Smith, 4 Cir., 67 F.2d 451, 457. The case last cited bears particularly upon the jurisdiction of the court to direct the officials of the government to return plaintiff's mine to his possession, which would involve the granting of relief in the nature of mandamus. In giving the reason why the court had no such power to direct official action by an officer of the government, we said:

"In the first place, the District Courts of the United States are without jurisdiction to issue writs of mandamus to control

official action of executive officers of the government even where such writs would lie at common law. Covington & C. Bridge Co. v. Hager, 203 U. S.109, 27 S.Ct. 24, 51 L.Ed. 111; Rosenbaum v. Bauer, 120 U.S. 450, 7 S.Ct. 633, 30 L.Ed. 743; Kendall v. United States, 12 Pet. 524, 618, 9 L. Ed. 1181; McClung v. Silliman, 6 Wheat. 598, 5 L.Ed. 340; McIntire v. Wood, 7 Cranch 504, 3 L.Ed. 420. Consequently, even if this suit were treated as an application for mandamus, relief could not be afforded plaintiff. In the second place, any cancellation of orders or expunging of records would necessarily be done by defendants in their official capacity; and suits against them to compel action in their official capacity are suits against the United States, which cannot be maintained as the United States has not consented to be sued." (Citing cases).

Even if there were jurisdiction in the court of the cause of action alleged, the objections to venue and to failure to serve necessary parties would be fatal. Where complaint is made of the acts of a subordinate official who is acting pursuant to lawful orders of his superior, the superior is an indispensable party to the suit. Warner Valley Stock Co. v. Smith, 165 U. S. 28, 34, 17 S.Ct. 225, 41 L.Ed. 621; Gnerich v. Rutter, 265 U.S. 388, 44 S.Ct. 532, 68 L.Ed. 1068; Webster v. Fall, 266 U.S. 507, 45 S.Ct. 148, 69 L.Ed. 411; Ainsworth v. Barn Ballroom Co., supra. No valid service of process was had upon the Secretary of the Interior or the Mines Administrator, and they were suable only in the District of their residence.

For the reasons stated, the injunction must be dissolved and the suit dismissed. If property of plaintiff has been taken or damaged by the government, he has an adequate remedy in an appropriate suit for compensation; but there is no jurisdiction in the courts to interfere with officers of the executive department validly acting in their official capacities or to compel, either by mandamus or injunction, the doing of a thing which the law has intrusted to the discretion of the executive.

The order appealed from will be reversed and the cause will be remanded with direc-

tion to dismiss the bill for lack of jurisdiction.

Reversed and remanded with directions.