WHEELING VALLEY COAL CORPORATION et al. v. MEAD.

No. 6146.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 15, 1950.

Decided Dec. 20, 1950.

George A. Blackford, Wheeling, W. Va., and Gordon T. Kinder, Martins Ferry, Ohio, on brief for appellants.

Carl G. Bachmann, Wheeling, W. Va., for appellee.

Before PARKER, Chief Judge, SOPER, Circuit Judge, and CHESNUT, District Judge.

PARKER, Chief Judge.

This is an appeal from an order disallowing a claim in bankruptcy. Claimants are the Wheeling Valley Coal Corporation and the Wheeling Coal Company, corporations which on Aug. 26, 1942, leased two coal mines to the bankrupt Warner Coal Corporation under a contract providing for the payment of minimum royalties. A petition in involuntary bankruptcy was filed against the Warner Coal Corporation on October 9, 1943, and on October 23, 1943, the bankruptcy court appointed an operating receiver who entered into a contract with claimants prescribing the terms under which the mines were to be operated thereafter. The claim is for the sum of $14,757.87 and represents the excess of the minimum royalties provided in the contract of lease over payments received. The court below held that the claim should be disallowed affirming an order of the referee to the effect that the closing down of the mine, which occurred on June 15 and continued until the appointment of the receiver, was due to an interference with mining operations by "acts of government" or to "other causes

beyond the control of the lessee" within the meaning of the absolving clause of that part of the lease relating to minimum royalties. That clause is as follows:

"Anything herein to the contrary not withstanding, the Lessee shall have no obligation to make any minimum royalty payment under this lease for any month or months during which the Lessee has been prevented, for a period of ten (10) or more consecutive days, from carrying on its mining operations in the premises herein described as the result of fire, flood, explosion, damage to or destruction of improvements or equipment, riots, strikes, work stoppage, acts of God, acts of the government, acts of the public enemy, failure of car or river transportation facilities for coal, or other causes beyond the control of the Lessee."

Payments made under the lease were in excess of the minimum royalties due until the operation of the mines ceased on June 15, 1943. The position of the trustee is that minimum royalties subsequently accruing fall within the absolving clause.

The facts are that the government took over the operation of all coal mines on May 1, 1943, but they continued to be operated by their owners or lessees under existing contracts; and the mines here were continued in operation under the officers of the Warner Coal Corporation. They were closed down on June 15, but this was in order that work might be done on machinery and the intention was to resume operations within a week. Operations were not resumed at that time, however, because of a lawsuit, involving an attachment of funds, commenced against the corporation by one of its principal customers. Government regulation of labor conditions raised the cost of producing coal, O.P.A. regulations of price made it impossible to realize a profit on coal produced without leave to charge increased prices, and there were delays in securing orders permitting such prices to be charged. Lack of sufficient operating capital was an additional embarrassment; and the officers of the corporation permitted the mines to stand idle until the petition in bankruptcy was filed. The receiver began operations immediately after his appoint-

ment and conducted them with profit as long as he remained in possession.

Appellee lists seven causes for the failure of bankrupt to operate the mines, viz.: (1) the order of the War Labor Board of February 1943 for a six day week with time and a half for the sixth day; (2) the executive order of May 1, 1943, seizing the mines; (3) the order of the Coal Administrator increasing pay of slate pickers; (4) the order increasing vacation pay; (5) the order to refund lamp rentals; (6) the portal to portal order; and (7) the fixing of a maximum price by the O.P.A. The appellants, on the other hand, say that the failure to operate was primarily due to other causes, viz., lack of operating capital, worn out equipment, the lawsuit to which we have referred and the high cost of operation due to the condition of the mines.

It is clear, of course, that the seizure of the mines by the government did not interfere with their operation within the meaning of the absolving clause. This seizure continued their operation under existing arrangements and management. See Krug v. Fox, 4 Cir., 161 F.2d 1013. And it is also clear, we think, that, while the government regulations upon which appellee relies did increase the cost of producing coal and limit the price at which it could be sold and thus increased the financial difficulties of the bankrupt, these things cannot be said, of themselves, to be the cause of the discontinuance of mining operations. They were mere aggravating circumstances of a bad financial condition arising out of lack of sufficient operating capital and high operating costs, brought to a head by the law suit and attachment and the loss of customers to whom the product of the mines was being sold. The testimony of Whitney Warner, president of bankrupt, with respect to this matter is illuminating. He said:

"With respect to the months of June, July and August and September, it has always been our contention that we were prevented from operating because of the lawsuit in Ohio and the attachment of our funds in Ohio by the Ohio Edison Company plus the fact we were under government control and the miners were not working

too well and we didn't know what ultimate liability we might have as the result of the government interference both as to prices and as to our operating procedure."

Later in his examination he said:

"It wasn't the lawsuit in itself or the attachment in itself that collapsed everything; it was the fact our largest customer refused to continue paying us for coal, so we suddenly were faced with the fact that we had no money and couldn't operate, and it was their refusal to pay for the coal that was beyond our control. Sure we could have sold coal elsewhere. * * * If we had tried to sell coal elsewhere they would have clamped down immediately and forced us to either live up to the contract or pay them $125,000 we owed them".

And summing up, in answer to a question at the end of his cross examination, he said:

"Q. As a matter of fact by way of summation, Mr. Warner, isn't it a fact that you were prevented from mining coal because of the failure to run the business successfully and to keep contracts to furnish coal and due to the company's own financial weakness?

"A. Well, I think that was to a large measure true, yes, but the financial situation of the company while it was weak nevertheless it was adequate so long as Cleveland-Cliffs Iron Company and Ohio Edison and W. H. Warner and Company, Incorporated, were back of it, but when Ohio Edison tipped over the apple cart that just ended the whole show, and their action was the cause of—the primary reason why we never reopened again. I think if it had not been for that we could have gotten started again in July or August. June was a bad month because of work stoppages and a number of other things."

In the light of this testimony, it is idle to contend that the lessee was "prevented from carrying on its mining operations" by "acts of the government" or "other causes beyond the control of the lessee", within the meaning of the absolving clause. The most that can be said is that government regulations combined with other causes, such as lack of sufficient capital and worn out machinery, to make the operation of the mines unprofitable and that an unexpected lawsuit and loss of expected patronage caused them to be closed down; but this does not mean that the carrying on of mining operations was prevented by "acts of the government" or that financial difficulties can be treated as "causes beyond the control of the lessee." Under familiar principles of interpretation, the general expressions "acts of the government" and "causes beyond the control of the lessee" are limited to things of the same general sort as those specifically set forth in the same connection, which are, "fire", "flood", "riots", "strikes", "work stoppages", "acts of God" and "failure of car or river transportation for coal", things which directly and of themselves prevent the carrying on of mining operations, not acts or causes which in conjuction with others merely render such operations unprofitable. See Swift & Co. v. Columbia Ry., Gas & Electric Co., 4 Cir., 17 F.2d 46, 51 A.L.R. 983; Berwind-White Coal Mining Co. v. Solleveld, 4 Cir., 11 F.2d 80; Hellenic Transport S. S. Co. v. Archibald McNeill & Sons, D.C.Md., 273 F. 290, 296. As said by Judge Rose in the case last cited:

"In order that the contingencies specified in them [excepting clauses] shall constitute a good defense, performance must have been thereby rendered in a practical sense impossible, illegal, or dangerous. * * * It is not sufficient that the happening of one of them adds materially to the * * * embarrassment of the parties relying on it, if nevertheless it is still possible to perform. * * * If by itself it [the restraint] could not have prevented performance, it will not excuse merely because, in combination with nonexcepted clauses, it did so."

Very much in point is the case of Swift & Co. v. Columbia Ry., Gas & Electric Co., supra [17 F.2d 47], in which a contract required the purchase of a minimum of electric power but contained an absolving clause very much like the one here involved including, after the enumeration of strikes etc., "any cause reasonably beyond its control". The defense was that because of a crop failure, which was a matter beyond

its control, the defendant could not use the minimum of current required and hence was excused by the terms of the absolving clause. In holding to the contrary, we said:

"It will be noted that, to excuse performance under paragraph 10, the cause relied on must have been one which prevented defendant from receiving, using, or applying the electric current provided for. And it is settled that, to excuse performance under an absolving clause, the cause relied on must have been the proximate cause of the failure to perform. Berwind-White Coal Mining Co. v. Solleveld, 4 Cir., 11 F.2d 80, and cases there cited. Williston on Contracts, vol. 3, § 1968. To excuse performance of this contract on the part of the defendant, therefore, it would have to appear that the cause relied on, viz. the weather conditions and the boll weevil resulting in the shortage of the cotton crop, was the proximate cause of defendant's failure to receive, use, or apply the current for which it had contracted. We are satisfied that in no proper sense can they be considered the proximate cause of such failure. * * *

"But, even if the crop shortage be assumed to be the proximate cause of defendant's failure to use the minimum current contracted for, we are satisfied that such cause of failure does not fall within the conditions excusing performance. It will be observed that the general clause absolving the company from obligation to pay the minimum amount, if prevented from receiving, using, or applying the current by 'any cause reasonably beyond its control and not attributable to its neglect,' follows a particular specification of causes which shall excuse such performance, including 'strikes, stoppage of labor, riot, fire, flood, invasion, insurrection, accident, the order of any court, judge, or civil authority, the act of God.' And it is well settled that in such case the rule of construction known as Lord Tenderden's rule is applicable, that, where particular words of description are followed by general terms, the latter will be regarded as referring to things of a like class with those particularly described—ejusdem generis. Hickman v. Cabot, 4 Cir., 183 F. 747; Southern Ry. Co. v. Columbia Compress Co., 4 Cir., 280 F. 344; Carnegie Steel Co. v. U. S., 240 U.S. 156, 36 S.Ct. 342, 60 L.Ed. 576."

In Williston on Contracts vol. 3 sec. 1968, the rule applicable is stated as follows:

"It has become common for manufacturers and others to insert in their contracts clauses relieving them from liability in case of strikes and other unforeseen casualties. The words of these clauses are not identical and it can only be said that while such agreements are legal, it is essential to prove that a strike or casualty within the terms of the clause in question was the actual cause of non-performance; and also that unless the clause clearly indicates that increased difficulty or enhanced prices (as distinquished from impossibility) due to the casualties in question shall afford an excuse, they will not be held to do so, at least unless extreme in degree. * * * 'Shortage of cash or inability to buy at a remunerative price' cannot be regarded 'as a contingency beyond the seller's control.' "

See also Samuel H. Cottrell & Son v. Smokeless Fuel Co., 4 Cir., 148 F. 594, certiorari denied 205 U.S. 544, 27 S.Ct. 792, 51 L.Ed. 923; Bennett v. Howard, 175 Ky. 797, 195 S.W. 117, L.R.A. 1917E, 1075, and note at 1078; Blythe & Co. v. Richards, T. & Co., 85 L.J.K.B.N.S. (Eng.) 1425; S. Instone & Co. v. Speeding M. & Co., 114 L.T. N.S. (Eng.) 370; Bolckow, V. & Co. v. Compania Minera de Sierra Menera, 115 L. T.N.S. (Eng.) 745; Kempner v. Goddard Grocer Co., 8 Cir., 5 F.2d 807; First Nat. Bank v. Fairchester Oil Co., 267 App.Div. 281, 45 N.Y.S.2d 532; note 51 A.L.R. 991 et seq.

The real cause of the closing down of the mines here, as shown by the testimony of bankrupt's president, was the financial weakness inherent in bankrupt's organizational structure combined with the effects of an unexpected law suit, loss of customers and market conditions resulting from government regulation and control. None of these things, nor all of them taken together, can reasonably be said to have been among the contingencies contemplated by the absolving clause.

A second point in the case is that, even if allowed, the claim should be limited to the period prior to the filing of the petition in bankruptcy on October 9, which would reduce it to $12,530.54. It is contended that the minimum royalty which accrued between the filing of the petition in bankruptcy and the appointment of the receiver is not allowable as a claim against the estate of the bankrupt. The answer is that upon the rejection of the lease by the receiver as a result of the making of the substituted contract on October 23, the lessors were entitled to treat the contract as breached by the bankruptcy and to file claim for the damage sustained including rent for not exceeding one year, limited here, of course, to Oct. 23. The situation, we think, is covered by sec. 63, sub. a(9) of the Bankruptcy Act as amended, 11 U.S.C.A. § 103, sub. a(9), which provides:

"Debts of the bankruptcy may be proved and allowed against his estate which are founded upon * * * (9) claims for anticipatory breach of contracts, executory in whole or in part, including unexpired leases of real or personal property: Provided, however, That the claim of a landlord for damages for injury resulting from the rejection of an unexpired lease of real estate or for damages or indemnity under a covenant contained in such lease shall in no event be allowed in an amount exceeding the rent reserved by the lease, without acceleration, for the year next succeeding the date of the surrender of the premises to the landlord or the date of reentry of the landlord, whichever first occurs, whether before or after bankruptcy, plus an amount equal to the unpaid rent accrued, without acceleration, up to such date: * * *."

As said by Judge Yankwich in Re Benguiat D. C., 20 F.Supp. 504, 508: "It is obvious that it was the intent of the Congress to give to landlords an absolute right to damages accruing to them through the rejection of the lease, the claim being limited, however, to a year's rental." See also Rocky Mountain Fuel Co. v. Whiteside, 10 Cir., 110 F.2d 778, 129 A.L.R. 698 and note at 708; and City Bank Farmers Trust Co. v. Irving Trust Co., 299 U.S. 433, 438, 57 S.Ct. 292, 81 L.Ed. 324.

The order appealed from will be reversed and the case will be remanded with direction to allow the entire amount claimed as a general unsecured claim against the bankrupt estate.

Reversed.