Quentin **STROUD** et al., Appellants,

v.

Ezra **T. BENSON**, Secretary of Agriculture of the United States of America, et al., Appellees.

No. 7555.

United States Court of Appeals Fourth Circuit.

Argued Jan. 17, 1958.

Decided April 1, 1958.

Jesse A. Jones, Kinston, N. C. (Jones, Reed & Griffin, Kinston, N. C., and M. E. Cavendish, Greenville, N. C., on brief), for appellants.

Samuel D. Slade, Attorney, Department of Justice, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Julian T. Gaskill, U. S. Atty., Raleigh, N. C., and Lionel Kestenbaum, Attorney, Department of Justice, Washington, D. C., on brief), for appellee, Ezra T. Benson, Secretary of Agriculture.

William T. Joyner, Raleigh, N. C., for appellee, Flue-Cured Tobacco Cooperative Stabilization Corp.

Before PARKER, Chief Judge, and SOPER and SOBELOFF, Circuit Judges.

SOBELOFF, Circuit Judge.

A number of tobacco farmers instituted suit in the United States District Court for the Eastern District of North Carolina against the Secretary of Agriculture and others to contest the validity of provisions of the 1957 tobacco price support program which required certain varieties of tobacco, known as "discount varieties," to be identified as such when offered for sale on auction warehouse floors. The plaintiffs complained of arbitrary, unauthorized and illegal discrimination against these varieties and sought a declaration of invalidity, an injunction against the enforcement of the Secretary's rules and regulations complained of, and the termination of arrangements made for their implementation and enforcement.

In addition to the injunction against the regulations for identification of flue-cured[1] tobacco upon a variety basis, particularly by the issuance of different colored marketing cards and distinctive warehouse basket tickets, the plaintiffs sought that the Secretary and his co-

---

1. Jahn, Tobacco Dictionary (1954), p. 68:
*"Flue-cured tobacco*

"Tobacco cured in barns formerly heated by means of flues circulating the heat and carrying the smoke away. Flue-cured types, frequently spoken of as Bright Tobacco, are extensively grown in Virginia, northern and eastern North Carolina, eastern South Carolina, southeastern Georgia, and northern Florida. Flue-cured leaf is used in the manufacture of cigarettes and smoking and chewing tobaccos and for export."

defendants be "directed to support plaintiffs' flue-cured tobacco at 90% of parity." One of these other defendants is the Commodity Credit Corporation, a wholly owned corporate agency of the United States, through which the Secretary is authorized and empowered to provide funds for price support. This defendant is by statute immune from the injunctive process. 15 U.S.C.A. § 714b(c). Loans are made by the Corporation as agent of the Secretary to another defendant, the Flue-Cured Tobacco Cooperative Stabilization Corporation of Raleigh, North Carolina, which is chartered under the State laws of North Carolina. The individual defendants, all North Carolinians, are those who constitute the Agricultural Stabilization and Conservation Committee of the United States Department of Agriculture for the State of North Carolina, and its administrative officer, or are managers of several County Agricultural Stabilization offices. These perform purely administrative duties in the execution of the regulations.

The background and development of the 1957 tobacco loan program, including the provisions under attack, may be briefly summarized. American produced flue-cured tobacco had for many years consistently commanded premium prices, especially from foreign buyers, because of its recognized "full-bodied," "full-flavored" and "aromatic" characteristics. As much as one-third to one-half of this country's production entered the export trade notwithstanding that lighter-bodied tobaccos, deficient in the sought after flavors and aromas, were available to foreign buyers at 50% or 80% of the cost of the American standard varieties.

In 1955 and 1956 the market was seriously disrupted by the appearance of three new varieties, known as Coker 139 and 140, and Dixie Bright 244. They were undesirable because wanting in the characteristics, which distinguished American tobaccos. Tobacco known to be of these varieties brings much less than the established varieties. Yet they resembled the regular stock in appearance and could not be identified in cured leaf form when offered on the auction sale warehouse floors. Only after purchase was the deficiency discoverable, too late to give protection to the purchaser. The effect was loss of confidence in the tobacco offered at the auctions, and depressed prices for tobacco generally, because customers hesitated to pay full prices for an article liable to be of short quality.

Complaints from foreign and domestic buyers were numerous and persistent. The new varieties were definitely not wanted in the market, but they offered one advantage to the grower; they were resistant to black shank and wilt and more pounds could be raised per acre of these than of the traditional varieties. A force that may be likened to Gresham's Law in finance was operating in the tobacco market to drive out the highly prized and higher priced varieties. The "discount" varieties were fast taking over. In 1956 as much as 50 to 60% of the tobacco planted was of this new category. As Judge Gilliam, in the District Court, found, the result was to visit a penalty on all producers of the desirable, and more valuable, standard American varieties, and 22.-49% of the 1956 crop went into the stabilization pool under price supports. Another such season, the District Judge found, "would be disastrous, perhaps fatal, to the price support program." [155 F.Supp. 489.]

The prospects for the future of the industry were indeed alarming. The Department of Agriculture counseled with scientists in agricultural colleges and experimental stations, representatives of the tobacco growing states and many persons engaged in all branches of the tobacco business, including growers. A plan was recommended almost unanimously for the identification of the objectionable varieties, by inspections during growth, and by laboratory examination of samples taken in the field. Only the breeder of the 139 and 140 seed and his chemist, and two other

persons dissented. They favored a continuance of the grading methods which had prevailed before the discount varieties came upon the scene—methods which in recent experience had proved inadequate to the need.

The 1957 tobacco price support program adopted by the Secretary of Agriculture embodied the new features. As early as December 18, 1956, the Department announced that changes would be made in the 1957 flue-cured tobacco price support program to discourage production of varieties 139, 140 and 244, irrespective of grade, by supporting these varieties at one-half the support rates for others. It was also made known that support rates would be adjusted to reflect current demand patterns and to encourage cultural practices favoring increase in the proportion of the crop which has desirable flavor and aroma characteristics. Further announcements came in the winter and spring; one notice was mailed to each flue-cured producer about mid-January.

While the precise implementation of the plan for distinguishing varieties by use of different basket tickets was not made known before the beginning of the planting season, it was early declared and repeated that one condition of eligibility for full participation in price support benefits would be proof of the variety. As finally formulated the plan provided for varieties to be established by government inspection, photographs of the growing plants, laboratory examination of samples, as well as information from the farmers. The initial determination was to be made by the County Committee, consisting of farmers, subject to the grower's right to demand reconsideration by the Committee, and examination by variety-identification specialists other than those who previously examined the tobacco being grown on his farm.

On the auction warehouse sale floor the acceptable varieties were put in baskets bearing white marketing cards; the others in baskets bearing a distinguishable card with two stripes printed thereon, and the latter tobaccos, under the plan, received one-half the support to which the others were entitled. The Secretary adopted the 50% fraction, because, according to his findings, it represented the average ratio of the worth of the discount varieties to the worth of regular varieties.

The effect of the plan was swift and impressive. Farmers readily conformed and bidders had the desired assurance that there was no danger of an admixture of unwanted varieties with the standard varieties. There came a sharp and radical reversal; instead of an estimated 50 to 60%, as in 1956, less than 2% of the farmers grew "discount varieties" in 1957. Instead of nearly one-fourth of the crop (22.49%) entering the stabilization pool, as in 1956, the 1957 season witnessed a dramatic restoration of confidence and wholesomeness in the market, and it is estimated that only three to four per cent of the crop had to enter the pool.

Motions to dismiss on jurisdictional grounds were interposed which, according to the opinion filed by the District Judge, he denied, despite doubts, in the belief that it would be in the public interest to decide the case on the merits. In a full and careful opinion he sustained the challenged regulations and procedures against every attack. The jurisdictional question, however, claims our attention and we are bound to deal with it despite the failure of the Secretary to cross appeal. United States v. American Ry. Express Co., 1924, 265 U.S. 425, 44 S.Ct. 560, 68 L.Ed. 1087; Langnes v. Green, 1931, 282 U.S. 531, 535, 51 S.Ct. 243, 75 L.Ed. 520; Jaffke v. Dunham, 1957, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314.

We have recited the facts in detail sufficient to give an understanding of the nature of the case and the motion to dismiss.

In the case of the Secretary the answer to the jurisdictional question is clear. As his official residence is in the District of Columbia, only there may he be sued. Butterworth v. Hill, 1885,

114 U.S. 128, 5 S.Ct. 796, 29 L.Ed. 119; Blackmar v. Guerre, 1952, 342 U.S. 512, 72 S.Ct. 410, 96 L.Ed. 534; Krug v. Fox, 4 Cir., 1947, 161 F.2d 1013; Berlinsky v. Woods, 4 Cir., 1949, 178 F.2d 265; Hunter v. United States, 4 Cir., 1950, 183 F.2d 446.

■ But is the Secretary an indispensable party, without whom the litigation may not proceed against the remaining defendants? The decided cases do not seem at first glance to follow a consistent course, due largely to differences in the factual context in which the legal question arose; but the principle to be deduced is that one must look to the nature and effect of the proceeding and not merely to the names of titular parties. Ex parte State of New York, No. 1, 1921, 256 U.S. 490, 500, 41 S.Ct. 588, 65 L.Ed. 1057; Land v. Dollar, 1947, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209. If, broadly considered, the suit is in essence one against persons threatening the invasion of a private right, they may be enjoined. If they claim to be acting under an authority which the law does not recognize, the absence from the proceedings of the official whose unlawful orders they rely upon does not bar the action against them. The rule was applied by this Court in Ferris v. Wilbur, 4 Cir., 1928, 27 F.2d 262, 264 in an opinion by Judge Parker:

"Where the act complained of is not authorized by statute, or where the statute authorizing it is void because in conflict with some provision of the Constitution, the person attempting it may be restrained in a proper case, notwithstanding his claim that he is acting in his official capacity. In such case he is acting, not within the law, but outside it, his act is not the act of the government, and the law affords him no protection for what he is doing or is about to do. This is true, whether he be the head of a department or merely a subordinate acting under orders; 'and, if a subordinate, there is no necessity of joining as defendant the head of the department because the orders of the head are immaterial if the act sought to be enjoined is not authorized by law."

The decision follows the rule of State of Colorado v. Toll, 1925, 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927, where it was sought to enjoin the superintendent of a national park from exercising control over traffic therein. His right to do so was attacked by the State of Colorado on the ground that it had not ceded jurisdiction to the United States. The Supreme Court held that he could be proceeded against in a federal court, to restrain him as an individual, without joining his superior officers. See also: United States v. Lee, 1882, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171; Goltra v. Weeks, 1926, 271 U.S. 536, 46 S.Ct. 613, 70 L.Ed. 1074.

■ Equally certain and confirmed by authority is the rule that if the judgment or decree granting the relief sought will require the superior officer to take action, either directly or through a subordinate, he is an indispensable party. Precisely in point is Berlinsky v. Woods, 4 Cir., 1949, 178 F.2d 265, 266, 267, where Judge Soper said, "Since * * * the purpose of the suit is to require [the Housing Expediter] to take action in the exercise of his statutory powers, he is an indispensable party to the suit which cannot go on without him; and the case must therefore be dismissed as to the Area Rent Director and the Sheriff of Baltimore City."

■ Where the purpose of the suit against a subordinate was in reality to control the action of the Secretary of the Interior, the Secretary was held indispensable. Warner Valley Stock Company v. Smith, 1897, 165 U.S. 28, 17 S.Ct. 225, 41 L.Ed. 621; and so also where the plaintiff demanded a more liberal permit than the defendant had power to grant under his delegated authority, the superior was ruled indispensable. Gnerich v. Rutter, 1924, 265 U.S. 388, 44 S.Ct. 532, 68 L.Ed. 1068. See also, Web-

ster v. Fall, 1925, 266 U.S. 507, 45 S. Ct. 148, 69 L.Ed. 411; Yarnell v. Hillsborough Packing Co., 5 Cir., 1934, 70 F.2d 435, 92 A.L.R. 1475; Janes v. Lake Wales Citrus Growers Ass'n, 5 Cir., 1940, 110 F.2d 653.

Especially is this rule applied where the judgment awarded would "expend itself on the public treasury or domain, or interfere with the public administration." Land v. Dollar, 1947, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209. See also, Williams v. Fanning, 1947, 332 U.S. 490, 68 S.Ct. 188, 92 L. Ed. 95.

 Here plaintiffs demand a doubling of their price support payments which can come only from moneys supplied by the United States. Such a case cannot be prosecuted without making the United States or the Secretary a party. We are dealing here with public money, not as in Stark v. Wickard, 1944, 321 U.S. 288, 305, 64 S.Ct. 559, 88 L.Ed. 733, with producers' money. It does not matter if the approach is indirect; the thrust of the suit which names others is in actuality against the Secretary and his administrative regulations. The impact would be on funds he administers by authority of Congress. To borrow Justice Black's expression, "the government's liability cannot be tried 'behind its back.'" See: Mine Safety Appliances Co. v. Forrestal, 1945, 326 U.S. 371, 375, 66 S.Ct. 219, 222, 90 L.Ed. 140.

We have given consideration to the possibility that even apart from the prayer for a mandatory injunction for the payment of full price support, the plaintiffs might press their prayer for injunction against the marking of the baskets to distinguish varieties of tobacco. Our conclusion is against the suggestion. The marking of the baskets is only an administrative detail in the execution of the Secretary's regulations and cannot be adjudicated separately. The effect would be to nullify the regulations, because a restoration of the chaotic conditions of 1955–1956 would enlarge the volume of tobacco entering the stabilization pool and increase the burden of the public funds.

We are of the opinion that for want of a necessary party the motion to dismiss should have been granted on jurisdictional grounds. The order appealed from will accordingly be vacated, without any intimation, however, that the merits were not correctly decided by the District Judge, and the case will be remanded with direction that it be dismissed for lack of jurisdiction.

Vacated and remanded with direction to dismiss action.

Judge PARKER, who concurred in this opinion, died before its announcement.